MICHAEL H. MEISELMAN v. IRA S. MEISELMAN, LAWRENCE A. POSTON, PAUL EDWARD LLOYD, EASTERN FEDERAL CORPORATION, RADIO CITY BUILDING, INC., CENTER THEATRE BUILDING, INC., COLONY SHOPPING CENTER, INC., GENERAL SHOPPING CENTERS, INC., M & S SHOPPING CENTERS OF FLORIDA, INC., MARTHA WASHINGTON HOMES, INC., AND TRY-WILK REALTY COMPANY, INC.

No. 594A82

(Filed 27 September 1983)

1. Corporations § 13— closely held corporations—standard of review for cases coming under G.S. 55-125(a)(4) and G.S. 55-125.1

In an action by a minority stockholder in a closely held corporation, the trial court misapplied the applicable law in denying plaintiff's claim for relief under G.S. 55-125(a)(4) and G.S. 55-125.1. Under G.S. 55-125(a)(4) a trial court is: (1) to define the "rights or interests" the complaining shareholder has in the corporation; and (2) to determine whether some form of relief is "reasonably necessary" for the protection of those "rights or interests." For plaintiff to obtain relief under the expectations analysis, he must prove that (1) he had one or more substantial reasonable expectations known or assumed by the other participants; (2) the expectation had been frustrated; (3) the frustration was without fault of plaintiff and was in large part beyond his control; and (4) under all of the circumstances of the case plaintiff is entitled to some form of equitable relief.

2. Corporations § 13— closely held corporations—summary judgment for majority stockholder improper—findings of fact failing to address "rights or interests" of minority stockholder

In an action brought by a minority stockholder in a closely held corporation where the trial court entered summary judgment for the majority stockholder, the trial court's findings of fact failed to address the "rights or interests" of the minority stockholder in the family corporations, and the case must be remanded to the trial court for an evidentiary hearing to resolve the issue. On remand after hearing the evidence, the trial court is to: (1) articulate the minority stockholder's "rights or interests"—his "reasonable expectations"

Meiselman v. Meiselman

— in the corporate defendant; and (2) determine if these "rights or interests" are in need of protection, and thus, that relief of some sort should be granted. In addition, the trial court is to prescribe the form of relief which the evidence indicates is most appropriate, should it find that relief is warranted.

**3. Corporations § 12— claim that majority stockholder usurped corporate opportunity — findings of fact by trial court insufficient on issue**

         In an action in which plaintiff claimed that defendant, majority stockholder, breached his fiduciary duty to the corporate defendant, in which plaintiff and the individual defendant both had interests, by usurping a corporate opportunity which belonged to them — the opportunity to buy stock of a corporation solely owned by the individual defendant — the trial court failed to focus on the appropriate issue and the findings of fact were not sufficient. When an officer or director is charged with having usurped a corporate opportunity, he or she must establish under G.S. 55-30(b)(3) that the "corporate transaction" in which he or she was engaged is "just and reasonable" to the corporation because it was not an opportunity or "corporate transaction" which the corporation itself would have wanted.

         Justice MARTIN concurring in the result.

         Chief Justice BRANCH and Justice COPELAND join in this concurring opinion.

         APPEAL as a matter of right from a decision of the Court of Appeals, one judge dissenting.

         This case was tried before *Judge Robert D. Lewis* during the 26 January 1981 Civil Session of Superior Court, MECKLENBURG County. In his memorandum of judgment, *Judge Lewis* denied plaintiff's claims for relief; plaintiff then appealed to the Court of Appeals. In an opinion written by *Judge Becton* with *Judge Wells* concurring, the Court of Appeals reversed. *Meiselman v. Meiselman,* 58 N.C. App. 758, 295 S.E. 2d 249 (1982). Because *Judge Hill* dissented in the case, defendants appeal to this Court as a matter of right under N.C.G.S. § 7A-30(2) (1981).

         *Fleming, Robinson, Bradshaw & Hinson, P.A., by Russell M. Robinson, II, Attorney for plaintiff-appellee.*

         *Blakeney, Alexander and Machen, by J. W. Alexander, Jr., Attorney for individual defendants; Farris, Mallard & Underwood, P.A., by Ray S. Farris and David B. Hamilton, Attorneys for corporate defendants.*

FRYE, Justice.

In this appeal, we must determine whether Michael Meiselman, a minority shareholder with a substantial percentage of the outstanding stock in a group of family-owned close corporations, is entitled to relief under N.C.G.S. § 55-125(a)(4) and N.C.G.S. § 55-125.1, the statutes granting trial courts the authority to order dissolution or another more appropriate remedy when "reasonably necessary" for the protection of the "rights or interests" of the complaining shareholder. In so doing, we will articulate for the first time the analysis a trial court is to apply in resolving suits brought under these two statutes. We must also determine whether the trial court erred in concluding that Ira Meiselman, Michael's brother, committed "no actionable breach of fiduciary responsibility" as an officer or director of the defendant corporations through his sole ownership of the stock in a corporation holding a management contract with one of the family corporations. After outlining in detail the pertinent facts in this case and the development of the law in the area of corporate dissolution, we will address first the question of whether the trial court erred in denying Michael's claim for relief under N.C.G.S. § 55-125(a)(4) and N.C.G.S. § 55-125.1.

I.

Michael Meiselman, the plaintiff and complaining minority shareholder in this action, and Ira Meiselman, one of the defendants in this action, are brothers. Michael, the older of the two, was born in 1932 and has never married. Ira was born ten years later. He is married and has two children. The two men are the only surviving children of Mr. H. B. Meiselman, who immigrated to the United States from Austria in 1913. Over the years, Mr. Meiselman accumulated substantial wealth through his development of several family business enterprises. Specifically, Mr. Meiselman invested in and developed movie theaters and real estate. Several of the enterprises were merged into Eastern Federal Corporation [hereinafter referred to as Eastern Federal], a close corporation, most of the stock of which is owned by Ira and Michael. In addition, there are seven other corporations[1] which,

1. The seven other corporations are: Radio City Building, Inc.; Center Theatre Building, Inc.; Colony Shopping Center, Inc.; General Shopping Centers, Inc.;

together with Eastern Federal, comprise the Meiselman family business and are the corporate defendants in this case.

Beginning in 1951, Mr. Meiselman started a series of *inter vivos* transfers of corporate stock in the various corporations which, generally speaking, he divided equally between his two sons. However, in March 1971 Mr. Meiselman transferred 83,072 shares of stock in Eastern Federal to Ira, while Michael received only 1,966 shares in the corporation. The next month Michael transferred the control of his stock in the family corporations to his father in trust, a trust Michael could revoke without his father's consent only if he married a Jewish woman.[2]

The effect, then, of these transfers of stock from Mr. Meiselman to his two sons was to give Ira, the younger son, majority shareholder status in Eastern Federal while relegating Michael, the older son, to the position of minority shareholder. In addition, Ira owns a controlling interest in all of the other family corporations except General Shopping Centers, Inc., the corporation in which he and Michael hold an equal number of shares.

Michael owns 29.82 percent of the total shares in the family corporations, although he contends that once the shares attributed to intercorporate ownership (shares the various corporations own in each other) are distributed between himself and Ira, his ownership would amount to about 43 percent of the family business. The book value of all of the corporations was $11,168,778 as of 31 December 1978. The book value of Michael's shares in all of the corporations using the 29.82 percent figure, was $3,330,303 as of that date.

As is true of many close corporations, the two shareholders — Michael and Ira — were employed by the family corporations. Michael began working for the family business in 1956 and Ira began nine years later in 1965. The extent of Michael's participation in the family corporations from 1961 until 1973 is not clear. Michael contends that he has worked continuously for the family business except for an interim of about one and one-half

M & S Shopping Centers of Florida, Inc.; Martha Washington Homes, Inc.; and Try-Wilk Realty Co., Inc.

2. Michael and his father revoked the trust by agreement in February 1976.

years. Ira would characterize Michael's participation differently. At any rate, both sides agree that from 1973 until 1979 Michael was employed by the family business. It is also clear that Ira fired Michael in September 1979, less than one month after Michael filed suit against Ira in connection with Ira's sole ownership of the stock in a corporation which held a management contract with Eastern Federal.

In the certified letter Ira sent to Michael informing Michael that he was being fired, Ira also notified his brother that his car insurance, his hospital insurance and his life insurance policies were all being terminated. In addition, Ira asked his brother in that same letter to return his "Air Travel credit card" and "any other corporate cards you might have as any further use of them is not authorized." Ira then sent his brother a second certified letter demanding payment within ten days to Eastern Federal of Michael's note of $61,500 plus interest of $2,028.66 and the balance of Michael's open account, $19,000. Furthermore, Lawrence A. Poston, Vice President and Treasurer of Eastern Federal stated that the effect of the letter terminating Michael's employment "also was to terminate Michael's participation in the profit-sharing trust."

In his deposition, Ira essentially admitted that he fired his brother in response to the lawsuit Michael had brought challenging Ira's sole ownership of Republic Management Corporation [hereinafter referred to as Republic], the corporation with which Eastern Federal had contracted to provide management services. However, Ira indicated that Michael's loss of employment was only an incidental effect of his termination of the employment contract between the two corporations, a corporate decision he felt was justified in light of the threat of continuing litigation on this matter. Ira stated that "[t]he purpose and the effect of the letter [terminating Michael's employment] were principally to advise [Michael] that we were terminating the arrangement between Eastern Federal and Republic and, correspondingly, that it would alter, affect, or eliminate his source of compensation as applied to Republic."

Republic was formed in 1973. As Ira stated, Republic was a "successor to two, or possibly three, previous companies of the same genre that had operated within the family framework back

to 1951." Ira also stated that he did not own all of the stock in those predecessor corporations, that "there were some that I remember in the early years that Michael might have owned 100% of that I didn't." The record indicates that Michael was one of the initial shareholders in 1951 of Fran-Mack Management, Inc., one of those predecessor corporations and that Ira did not become a shareholder in that particular corporation until 31 December 1963.

According to Ira, the function of Republic "was to provide a means whereby, primarily now, administrative and primarily home office expenses utilized on behalf of all the companies, or all the individual operating units, were apportioned back to those individual operating units or operating companies." In short, Republic was "nothing more than a tool" through which the administrative costs incurred in operating the various Meiselman business units — including over 30 theaters — were apportioned.

As noted above, Republic agreed to perform these management services as a result of a contract entered into between it and Eastern Federal. Specifically, Republic agreed to perform the management services in exchange for 5.5 percent of Eastern Federal's theater admissions and concession sales. Although Republic paid Michael an annual salary from 1973 until he was fired in 1979, Michael did not own any of the stock in the management corporation; Ira owned all of it. Although Republic earned profits some years while losing money in others, the net result was that it had retained earnings of over $65,000, earnings which only Ira as sole shareholder in Republic would enjoy and in which Michael claims he is entitled to share. It is this ownership to which Michael objects and upon which he bases his shareholder's derivative claim that Ira has breached the fiduciary duty he owes to the corporate defendants.

We turn now to an examination of the tenor of the relationship existing between Michael and Ira. In his brief, Ira contends "[t]he Record on Appeal reflects no bitterness and hostility between Michael and Ira, other than that which Michael generated after Mr. Meiselman's death in an effort to secure a redistribution of his father's patrimony." Further, he contends that "Michael was never denied participation in the management of the corporate defendants," that, on the contrary, Michael "voluntarily limited his participation in their affairs."

On the other hand, Michael vehemently denies Ira's characterization of their relationship and of his participation in the management of the corporations. In his deposition, Michael stated that his job has been "out in the field," and that when he had a recommendation to make he was, for the most part, to report it to his brother. Michael indicated that he was allowed to participate in the management of Eastern Federal in this manner apparently until the corporation entered into the management contract with Republic at issue here. Michael characterized this alleged change in his participation of the management of Eastern Federal as follows:

> My brother had the majority of stock in Eastern Federal Corporation before this management contract. As to whether he had the final say in the control of Eastern Federal Corporation, that is the point. He might have been the final say, but when Republic Management started, I lost all say-so because he wouldn't listen to anybody.

In addition, Michael contends that, among other things, he has not been "allowed to even come up to the office and have [sic] been discouraged in getting the full details as to what they [the companies] borrow"; that Ira "will not let me walk in the office where the film buyer is and talk to him, not even [to] help"; that "theaters are being sold without my knowledge and theaters are being built without my knowledge"; and that "my brother solely and without my consent, not only develops but closes, sells, does anything he wants with all of the properties." Finally, Michael claims that although he previously worked 60 to 70 hours a week, he has been "discouraged systematically over a number of years to where I cannot exert the time and effort that I want to."

In examining the record, we are struck by the tone of Ira's comments when referring to his dealings with his brother. Indeed, many of his statements indicate that although Michael may not have been actively prevented from entering the corporate offices, his participation in the decision-making carried on within those offices was less than welcome. For example, in testifying that Michael has never been barred from the home offices of the company, Ira stated that Michael "has exercised the privilege of going there on frequent occasions, *unannounced*, whenever he felt like it." (Emphasis added.) He also stated that "[w]e have never

failed, *when he is entitled to notice*, to give him adequate notice of stockholders' meetings." (Emphasis added.) Furthermore, in a letter to Michael's lawyer concerning, among other things, the possibility of Michael's serving on the boards of directors of the family enterprises, Ira's lawyer stated that, "[w]e have no desire to see the productive efforts of the boards be affected by possibly allowing them to function as a forum for airing personal hurts and slights; and we all recognize that the course of business activity for the companies is not going to be altered by Michael's representation."

Apparently in an attempt to further support his contention that Michael has never been excluded from participating in the management of the corporations, Ira testified that two corporate decisions were made or changed on the basis of objections Michael had lodged. In describing the abandonment of a proposed merger to which Michael had objected, Ira testified as follows:

> I don't mean to belittle him. In one of those instances, as a sign we were not completely ignoring him, we made some changes. Specifically, I know of one single complaint and that was a proposed merger of some of these defendants [in] 1976, regarding a real estate company similar to our previous merger with Eastern Federal. Unfortunately, my timing was very poor because he was taking his first what he called his pre-test, I'm not sure, I guess it's preparation for the bar exam. He did very poorly with it and it came at the same time, and he just raised cain with me.

The second corporate action to which Michael objected was Ira's sole ownership of the stock in Republic. Ira contends that he terminated the management contract between Republic and Eastern Federal (and in so doing fired Michael) in response to Michael's objections to Ira's sole ownership of Republic. We note, however, that in responding to Michael's objections, Ira terminated the employment contract between the two corporations, and, thus, Michael's employment, even though it was Ira's sole ownership of the stock in Republic and not the contract between Republic and Eastern Federal which was the source of their disagreement.

Perhaps most indicative of the tenor of the relationship between the two brothers is Ira's comment that "[y]es, it is my posi-

tion in this case that my brother, Michael, suffers as stated there [in defendant's brief] from crippling mental disorders and that was a reason that my father put me in control of the family corporations." Apparently in support of his allegations that his brother suffers from "crippling mental disorders," Ira presented evidence of an argument Michael had with his father which took place about 20 years ago during which Mr. Meiselman castigated Michael for having a non-Jewish woman at a family function. In addition, Ira testified to another fight which occurred between himself and Michael after he had failed to invite Michael to a football game to which all of the males in the family traditionally had been invited.

Finally, it appears the history of this litigation itself indicates a breakdown of the personal relationship between Michael and Ira. In June 1978, about two months after their father's death, Michael and Ira began negotiations in an effort to work out their differences. Over one year later, in August 1979, Michael filed suit. He was fired the next month. In short, this litigation and the tensions inherent in such activity have been *going on for over four years now.*

We turn now to the history of this litigation as it developed in the courts. In his amended complaint, Michael asked that the trial court "dissolve the Corporate Defendants under the provisions of G.S. 55-125(a) or, in the alternative, order such other relief under the provisions of G.S. 55-125.1 as the Court may deem just and equitable" because such relief is "reasonably necessary" for the protection of Michael's "rights and interests." Before this Court, Michael is requesting relief specifically under N.C.G.S. § 55-125.1(a)(4), a buy-out at fair value of Michael's interest in the corporate defendants. He is not seeking dissolution.

With respect to the derivative claim he brought asserting that Ira had breached the fiduciary duty he owes to the corporate defendants through his sole ownership of the stock in Republic, Michael asked that the "profits wrongfully diverted from the Corporate Defendants into Republic Management Corporation" be recovered.

The trial court denied both of Michael's claims. Michael then appealed to the Court of Appeals. In its well-written majority opinion, the Court of Appeals interpreted N.C.G.S. § 55-125(a)(4)

as authorizing liquidation in cases where the complaining share-holder has shown that "basic 'fairness' compels dissolution." *Meiselman v. Meiselman, supra,* 58 N.C. App. at 766, 295 S.E. 2d at 254-55. The Court of Appeals concluded that the complaining shareholder is not required to show "bad faith, mismanagement or wrongful conduct, but only real harm." *Id.* In finding "a plethora of evidence to suggest that Ira's actions have irreparably harmed Michael," the Court of Appeals further concluded that the trial court "misapplied the applicable law *and* abused its discretion by concluding that relief, other than dissolution, under G.S. 55-125.1 was not reasonably necessary for Michael's protection." *Id.* at 772, 295 S.E. 2d at 258 (emphasis in original). In so doing, it reversed the trial court judgment and remanded the case to the trial court "for the determination of an appropriate remedy under G.S. 55-125.1 that is reasonably necessary to protect Michael's rights and interests." *Id.* at 775-776, 295 S.E. 2d at 260.

In addition, the Court of Appeals also determined that the trial court erred in concluding that Ira had not breached the fiduciary duty he owes to the corporate defendants through his sole ownership of Republic. It reversed the judgment of the trial court on this derivative claim and remanded the case to the trial court "for entry of judgment on behalf of the defendant corporation against Ira, as sole owner of Republic, in the total amount of the profits accumulated to date in Republic plus interest and cost of this action." *Id.*

Judge Hill dissented in this case on both issues. Therefore, defendants appeal to this Court as a matter of right under N.C.G.S. § 7A-30(2).

## II.

We note at the outset that the enterprises with which we are dealing are close corporations, not publicly held corporations. This distinction is crucial because the two types of corporations are functionally quite different. Indeed, the commentators all appear to agree that "[c]lose corporations are often little more than incorporated partnerships." Comment, *Oppression as a Statutory Ground for Corporate Dissolution,* 1965 Duke L.J. 128, 138 (1965) [hereinafter cited as Comment, *Oppression*]. *See also* 2 F. O'Neal, *Close Corporations* § 9.02 (2d ed. 1971); Hetherington and Dooley, *Illiquidity and Exploitation: A Proposed Statutory Solution to the*

*Remaining Close Corporation Problem,* 63 Va. L. Rev. 1, 2 (1977); Israels, *The Sacred Cow of Corporate Existence: Problems of Deadlock and Dissolution,* 19 U. Chi. L. Rev. 778, 778-79 (1952); Comment, *Deadlock and Dissolution in the Close Corporation: Has the Sacred Cow Been Butchered?,* 58 Neb. L. Rev. 791, 796 (1979) [hereinafter cited as Comment, *Deadlock and Dissolution*].

Israels, a recognized expert in this area, succinctly defines a close corporation as a "corporate entity typically organized by an individual, or a group of individuals, seeking the recognized advantages of incorporation, limited liability, perpetual existence and easy transferability of interests—but regarding themselves basically as partners and seeking veto powers as among themselves much more akin to the partnership relation than to the statutory scheme of representative corporate government." Israels, *supra,* at 778-79.

This characterization of close corporations as little more than "incorporated partnerships" rests primarily on the fact that the "relationship between the participants [in a close corporation], like that among partners, is one which requires close cooperation and a high degree of good faith and mutual respect . . . ." 2 F. O'Neal, *Close Corporations* § 9.02. *See also* Hetherington and Dooley, *supra,* at 2; Note, *Corporations—Dissolution—Denial of Right to Participate in Management of Close Corporation Entitles Shareholder to Liquidation,* 74 Harv. L. Rev. 1461, 1463 (1961) [hereinafter cited as Note, *Corporations—Dissolution*]. Indeed, one commentator noted that "[a]n organizational structure of this nature—in which the investment interests are interwoven with continuous, often daily, interaction among the principals—necessarily requires substantial trust among the individuals." Comment, *Deadlock and Dissolution, supra,* at 795.

Professor O'Neal, perhaps the foremost authority on close corporations, points out that many close corporations are companies based on personal relationships that give rise to certain "reasonable expectations" on the part of those acquiring an interest in the close corporation. Those "reasonable expectations" include, for example, the parties' expectation that they will participate in the management of the business or be employed by the company. O'Neal, *Close Corporations: Existing Legislation and Recommended Reform,* 33 Bus. Law 873, 885 (1978). Other com-

mentators have also noted that those investing in close corporations have some of these same "reasonable expectations." Afterman, *Statutory Protection for Oppressed Minority Shareholders: A Model for Reform*, 55 Va. L. Rev. 1043, 1064 (1969); Comment, *Oppression, supra,* at 141; Comment, *Deadlock and Dissolution, supra,* at 795; Comment, *Dissolution Under the California Corporations Code: A Remedy for Minority Shareholders*, 22 U.C.L.A. L. Rev. 595, 616 (1975) [hereinafter cited as Comment, *Dissolution Under the California Corporations Code*].

Thus, when personal relations among the participants in a close corporation break down, the "reasonable expectations" the participants had, for example, an expectation that their employment would be secure, or that they would enjoy meaningful participation in the management of the business—become difficult if not impossible to fulfill. In other words, when the personal relationships among the participants break down, the majority shareholder, because of his greater voting power, is in a position to terminate the minority shareholder's employment and to exclude him from participation in management decisions.

Some may argue that the minority shareholder should have bargained for greater protection before agreeing to accept his minority shareholder position in a close corporation. However, the practical realities of this particular business situation oftentimes do not allow for such negotiations. In his article, *Special Characteristics, Problems, and Needs of the Close Corporation*, 1969 U. Ill. L.F. 1 (1969), Professor Hetherington, another recognized authority in this field, explains the situation as follows:

> . . . the circumstances under which a party takes a minority stock position in a close corporation vary widely. Many involve situations where the minority party, because of lack of awareness of the risks, or because of the weakness of his bargaining position, fails to negotiate for protection. Probably a common instance of this kind occurs where an employee or an outsider is given an opportunity to buy stock in a close corporation wholly or substantially owned by a single stockholder or a small group of associates, often a family. Typically, the controlling individual or group retains a substantial majority position. The opportunity to buy into the

business is highly valued by the recipient; his enthusiasm and weak bargaining position make it unlikely almost to a certainty that he will ask for — let alone insist upon — protection for his position as a minority stockholder. Purchases of stock in such situations are likely to be arranged without either party consulting a lawyer. The result is the assumption of a minority stock position without, or with only limited, appreciation of the risks involved.

*Id.* at 17-18 (footnote omitted).

In short, then, the "minority shareholder who acquired his shares to secure his position with the firm may have lacked sufficient bargaining power to force the majority to agree to terms which would enable him to protect his interests." Comment, *Dissolution Under the California Corporations Code, supra,* at 603-04. Indeed, as one commentator notes, "close corporations are often formed by friends or family members who simply may not believe that disagreements could ever arise." *Id.* Furthermore, when a minority shareholder receives his shares in a close corporation from another in the form of a gift or inheritance, as did plaintiff here, the minority shareholder never had the opportunity to negotiate for any sort of protection with respect to the "reasonable expectations" he had or hoped to enjoy in the close corporation.

Unfortunately, when dissension develops in such a situation, as Professor O'Neal notes, "American courts traditionally have been reluctant to interfere in the internal affairs of corporations . . . ." F. O'Neal, *Oppression of Minority Shareholders* § 9.04, at 582 (1975). This reluctance, as applied to a minority shareholder holding an interest in a close corporation, places the minority shareholder in a remediless situation. As Professor O'Neal points out, when the personal relationship among the participants in a close corporation breaks down, the minority shareholder has neither the power to dissolve the business unit at will, as does a partner in a partnership, nor does he have the "way out" which is open to a shareholder in a publicly held corporation, the opportunity to sell his shares on the open market. 2 F. O'Neal, *Close Corporations* § 9.02. Thus, the illiquidity of a minority shareholder's interest in a close corporation renders him vulnerable to exploitation by the majority shareholders. *E.g.,*

Hetherington and Dooley, *supra*, at 3-6. Professor Hetherington succinctly outlines in one of his articles the uniquely vulnerable position a minority shareholder occupies in a close corporation:

> The right of the majority to control the enterprise achieves a meaning and has an impact in close corporations that it has in no other major form of business organization under our law. Only in the close corporation does the power to manage carry with it the de facto power to allocate the benefits of ownership arbitrarily among the shareholders and to discriminate against a minority whose investment is imprisoned in the enterprise. The essential basis of this power in the close corporation is the inability of those so excluded from the benefits of proprietorship to withdraw their investment at will. The power to withdraw one's capital from a publicly held corporation or from a partnership is unqualified in the sense that the participant's right is not dependent upon misconduct by the management or upon the occurrence of any other event. The shareholder or partner can withdraw his capital for any or no reason.

Hetherington, *supra*, at 21.

According to Professor O'Neal, the "two principal conceptualistic barriers to the courts' granting relief to aggrieved shareholders" in such a situation are: "(1) the principle of majority rule in corporate management and (2) the business judgment rule." F. O'Neal, *Oppression of Minority Shareholders* § 9.04 at 582. In explaining the inapplicability of the legal construct firmly established in corporate law that when outvoted the minority must submit to the will of the majority, he writes as follows:

> Apparently without close examination, courts accord the principle of majority rule the same sanctity in corporate enterprises, including small businesses, that it enjoys in the political world. The principle of majority rule is in traditional legal thought a firmly established attribute of the corporate form. Yet not uncommonly a person, unsophisticated in business and financial matters, invests all his assets in a closely held enterprise with an expectation, often reasonable under the circumstances even in the absence of express contract, that he will be a key employee in the company and will have a voice in business decisions. Thus, when courts apply the

principle of majority rule in close corporations, they often disappoint the reasonable expectations of the participants.

*Id.* at 582-83.

In short, then, when the courts fail to provide a remedy for a minority shareholder whose "reasonable expectations" have been disappointed in the close corporation situation, the court, in effect, "compels a continuation of the association by legal constraint — what was once called 'togetherness by injunction' — a prospect which scarcely seems a desirable policy goal." Hetherington, *supra*, at 29. In other words, an "insistence that the antagonistic parties resolve their differences within the corporate framework" would seem "inconsistent with the traditional hesitance of courts of equity to enforce unwelcome personal relationships." Note, *Corporations—Dissolution, supra*, at 1463.

Apparently in response to these commentators' uniform calls for reform in this area of corporate law, many state legislatures have enacted statutes giving the tribunals in their states the power to grant relief to minority shareholders under more liberal circumstances. For example, at least seven states have given their courts the authority to grant dissolution of a corporation when the acts of the directors or those in control of the corporation are "oppressive" to the shareholders. Ill. Ann. Stat. ch. 32, § 157.86(a)(3) (Smith-Hurd Cum. Supp. 1983); Md. Corps. & Ass'ns Code Ann. § 3-413(b)(2) (1975); Mich. Comp. Laws Ann. § 450.1825(1) (1973); N. J. Stat. Ann. § 14A:12-7(1)(c) (West Cum. Supp. 1983); N. Y. Bus. Corp. Law § 1104-a(a)(1) (McKinney Cum. Supp. 1983); S. C. Code Ann. § 33-21-150(a)(4)(B) (Law. Co-op. Cum. Supp. 1982); Va. Code § 13.1-94(a)(2) (1978).

In interpreting the term "oppressive" as used in its dissolution statute, a New York Trial Court recently held in a case of first impression that where two controlling shareholders discharged the minority shareholder as an employee and officer of the two corporations in which he had an interest, thus severely damaging the minority shareholder's "reasonable expectations," their actions were deemed to be "oppressive" under New York Law. *In re the Application of Topper*, 107 Misc. 2d 25, 433 N.Y.S. 2d 359 (1980).

Furthermore, the Supreme Court of Illinois affirmed a Superior Court decree of dissolution where one shareholder was

deemed to have engaged in "oppressive" conduct within the meaning of its dissolution statute in depriving the other shareholders of participation in the management of the corporation. *Gidwitz v. Lanzit Corrugated Box Co.,* 20 Ill. 2d 208, 220, 170 N.E. 2d 131, 138 (1960). In defining the term "oppressive" in *Gidwitz,* the Supreme Court of Illinois wrote that the "word does not necessarily savor of fraud, and the absence of 'mismanagement, or misapplication of assets,' does not prevent a finding that the conduct of the dominant directors or officers has been oppressive." *Id.* at 214-15, 170 N.E. 2d at 135. The court also stated that the term is "not synonymous with 'illegal' and 'fraudulent.' " *Id. See also* Afterman, *supra,* at 1063 ("oppression" is "probably best defined in terms of the reasonable expectations of the minority shareholders in the particular circumstances at hand"); Comment, *Oppression, supra,* at 137-38 ("oppression" provision of corporate dissolution statutes "may be expected to afford relief in a variety of situations that range from exclusion from management in a family corporation to deliberate destruction of a subsidiary by the parent corporation"); Annot., 56 A.L.R. 3d 358 (1974). Indeed, one commentator noted that the result in *Gidwitz* "seems responsive to the special characteristics of a close corporation, the dissolution of which has increasingly been recognized as desirable whenever its shareholders have ceased to cooperate." Note, *Corporations—Dissolution, supra,* at 1463.

Similarly, at least three states have statutes authorizing a court to grant dissolution when those in control of the corporation are guilty of treating the corporate shareholders "unfairly." Cal. Corp. Code § 1800(b)(4) (West 1977) ("persistent unfairness"); Mich. Comp. Laws Ann. § 450.1825(1) (West 1973) ("wilfully unfair"); N. J. Stat. Ann. § 14A:12-7(1)(c) (West Cum. Supp. 1983).

In helping to establish this growing trend toward enactment of more liberal grounds under which dissolution will be granted to a complaining shareholder, the legislature in this State enacted in 1955 N.C.G.S. § 55-125(a)(4), the statute granting superior court judges the "power to liquidate the assets and business of a corporation in an action by a shareholder when it is established" that "[l]iquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder." Two other states have similar statutes—California and New York. Cal. Corp. Code § 1800(b)(5) (West 1977) (formerly § 4651(f)); N. Y. Bus. Corp.

Law § 1104-a(b)(2) (McKinney Cum. Supp. 1983). Indeed, one of the members of the drafting committee of the new Business Corporation Act, the Act which included N.C.G.S. § 55-125(a)(4), stated that in drafting the Act the committee "drew heavily on the Model Act of the American Bar Association and on the corporation laws of other states, particularly *California* and Ohio." Latty, *The History, Purpose, Spirit and Philosophy of the New Act, North Carolina Corporation Manual* (1960) (emphasis added). Furthermore, in commenting upon the new Act, Professor Latty stated that "[t]here would seem, then, to be no reason under the new Act for a court to approach the problem of liquidation of the business of a close corporation with substantially more conservatism than it would show in dissolving a partnership, free from any carry-over of the 'sacred cow' tradition of corporate existence." Latty, *The Close Corporation and the New North Carolina Business Corporation Act*, 34 N.C. L. Rev. 432, 449-50 (1956).

In interpreting the provision of its corporate dissolution statute which provides that such relief will be ordered where "liquidation is reasonably necessary for the protection of the rights or interests" of the shareholders, a California Appellate Court affirmed in *Stumpf v. C. E. Stumpf & Sons, Inc.,* 47 Cal. App. 3d 230, 120 Cal. Rptr. 671 (1975), a trial court's conclusion that relief was appropriate when supported by the following evidence: "The hostility between the two brothers had grown so extreme that respondent severed contact with his family and was allowed no say in the operation of the business. After respondent's withdrawal from the business, he received no salary, dividends, or other revenue from his investment in the corporation." *Id.* at 235, 120 Cal. Rptr. at 675. *See also In re the Application of Topper,* 433 N.Y.S. 2d at 366 ("rights and interests" of a minority shareholder in a close corporation "derive from the expectations of the parties and special circumstances that underlie the formation of close corporations").

In short, then, it appears that these new statutory schemes which permit involuntary dissolution of corporations pursuant to actions brought by minority shareholders—and which "virtually every state has"—"represent a concerted effort and recognition by the states that the perpetual existence of the corporate structure at common law is ill-suited to the functional realities of the

closely held corporation." Comment, *Deadlock and Dissolution,* *supra,* at 793. However, it is important to recognize that the statutes in question apply to *all* corporations, not just "close" corporations.[3] Of course, "the rights or interests of the complaining shareholder" will vary according to the circumstances, including the circumstance of the nature of the corporation, whether public or a close corporation. Likewise, whether liquidation (or some alternate form of relief) "is reasonably necessary for the protection of" those "rights or interests" will also depend, to a great extent, on whether the corporation is a public corporation or a close corporation.

### III.

[1] With this background in mind, we turn now to the primary issue in this case: whether the trial court misapplied the applicable law by concluding that relief under N.C.G.S. § 55-125(a)(4) and N.C.G.S. § 55-125.1 was not "reasonably necessary" for the protection of Michael's "rights or interests" in the defendant corporations. However, before we can decide whether the trial court "misapplied the applicable law" we must first determine what the applicable law is. In so doing, we will set out for the first time the analysis a trial court is to apply in determining whether relief should be granted to a complaining shareholder seeking relief under N.C.G.S. § 55-125(a)(4).

The basic question at issue is what standard we should adopt to determine whether a minority shareholder is entitled to dissolution or other relief. The statutes require a standard in which all of the circumstances surrounding the parties are considered in

---

3. "The first really extensive and imaginative statutory innovations on close corporations occurred in the North Carolina Business Corporation Act, enacted in 1955. The commission which drafted that act made a diligent study of the peculiarities of close corporations, and many sections of the act (although not limited in their application to close corporations) are designed to meet the special needs of close corporations." 1 F. O'Neal, *Close Corporations* § 1.14a. "One finds in legal writings from time to time the suggestion that there be a separate statute for close corporations. . . . In drafting the new Business Corporation Act, however, the General Statutes Commission felt that a single piece of legislation could embody the essential needs and safeguards with respect to both the closely held and the publicly held corporation. To attempt to define generally a category of close corporations is no easy matter." Latty, *The Close Corporation and the New North Carolina Business Corporation Act,* 34 N.C. L. Rev. 432, 455 (1956).

deciding whether relief should be granted and, if so, the nature and method of such relief.

When a shareholder brings suit seeking relief under N.C.G.S. § 55-125(a)(4) and N.C.G.S. § 55-125.1, he has the burden of proving that his "rights or interests" as a shareholder are being contravened. However, once the shareholder has established this, the trial court, in deciding whether to grant relief, "must exercise its equitable discretion, and consider the actual benefit and injury to [all of] the shareholders resulting from dissolution" or other possible relief. *Henry George & Sons, Inc. v. Cooper-George, Inc.,* Wash., 632 P. 2d 512, 516 (1981). "The question is essentially one for resolution through the familiar balancing process and flexible remedial resources of courts of equity." *Id.* To hold otherwise would allow a plaintiff to demand at will dissolution of a corporation or a forced buy out of his shares or other relief at the expense of the corporation and without regard to the rights and interests of the other shareholders.

Michael, as the complaining shareholder in this case, brought an action under N.C.G.S. § 55-125(a), the statutory provision which articulates four situations, one of which must be "established" before a Superior Court Judge has the power to liquidate a corporation in an action brought by a shareholder. Specifically, N.C.G.S. § 55-125(a) provides as follows:

> The superior court shall have power to liquidate the assets and business of a corporation in an action by a shareholder when it is established that:

> (1) The directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, so that the business can no longer be conducted to the advantage of all the shareholders; or

> (2) The shareholders are deadlocked in voting power, otherwise than by virtue of special provisions or arrangements designed to create veto power among the shareholders, and for that reason have been unable at two consecutive annual meetings to elect successors to directors whose terms had expired; or

> (3) All of the present shareholders are parties to, or are transferees or subscribers of shares with actual notice of a

written agreement, whether embodied in the charter or sep-
arate therefrom, entitling the complaining shareholder to liq-
uidation or dissolution of the corporation at will or upon the
occurrence of some event which has subsequently occurred;
or

     (4) Liquidation is reasonably necessary for the protection
of the rights or interests of the complaining shareholder.

     Michael alleged that he was entitled to relief under subsec-
tion (4); in effect, he is claiming that liquidation is "reasonably
necessary" for the protection of his "rights or interests."
However, before it can be determined whether, in any given case,
it has been "established" that liquidation is "reasonably
necessary" to protect the complaining shareholder's "rights or in-
terest," the particular "rights or interests" of the complaining
shareholder must be articulated. This is so because N.C.G.S.
§ 55-125(a)(4) refers to the "rights or interests" of *the complain-
ing shareholder*; the statute does not refer to the "rights or in-
terests" of shareholders generally. Therefore, the "rights or
interests" which Michael has in these family-run, close corpora-
tions must be determined with reference to the specific facts in
this case. In so doing, we hold that a complaining shareholder's
"rights or interests" in a close corporation include the
"reasonable expectations" the complaining shareholder has in the
corporation. These "reasonable expectations" are to be ascer-
tained by examining the entire history of the participants' rela-
tionship. That history will include the "reasonable expectations"
created at the inception of the participants' relationship; those
"reasonable expectations" as altered over time; and the
"reasonable expectations" which develop as the participants
engage in a course of dealing in conducting the affairs of the cor-
poration. The interests and views of the other participants must
be considered in determining "reasonable expectations." The key
is *"reasonable."* In order for plaintiff's expectations to be
reasonable, they must be known to or assumed by the other
shareholders and concurred in by them. Privately held expecta-
tions which are not made known to the other participants are not
"reasonable." Only expectations embodied in understandings, ex-
press or implied, among the participants should be recognized by
the court. Hillman, *The Dissatisfied Participant in the Solvent
Business Venture: A Consideration of the Relative Permanence of*

*Partnerships and Close Corporations*, 67 Minn. L. Rev. 1, 77-81 (1982). Also, only substantial expectations should be considered and this must be determined on a case-by-case basis. These requirements provide needed protection to potential defendants in this type case. *Cf. Capitol Toyota v. Gerwin, Miss.*, 381 So. 2d 1038 (1980). (Dissolution denied and relief limited to purchase of plaintiff's shares at book value as of the date he left employment with the corporation.)

In short, then, the "rights or interests" of a shareholder in any given case will not necessarily be the same "rights or interests" of any other shareholder. An articulation of those "rights or interests" will necessarily require a case-by-case determination based on an examination of the entire history of the participants' relationship—an examination not only of the "expectations generated by the participants' original business bargain," but also of the "history of the participants' relationship as expectations alter and new expectations develop over the course of the participants' cooperative efforts in operating the business." O'Neal, *supra*, at 888. In so holding, we recognize the rule that Professor O'Neal suggests should be applied in a corporation based on a "personal relationship":

> [A] court should give relief, dissolution or some other remedy to a minority shareholder whenever corporate managers or controlling shareholders act in a way that disappoints the minority shareholder's reasonable expectations, even though the acts of the managers or controlling shareholders fall within the literal scope of powers or rights granted them by the corporation act or the corporation's charter or bylaws.

> The reasonable expectations of the shareholders, as they exist at the inception of the enterprise, and as they develop thereafter through a course of dealing concurred in by all of them, is perhaps the most reliable guide to a just solution of a dispute among shareholders, at least a dispute among shareholders in the typical close corporation. In a close corporation, the corporation's charter and bylaws almost never reflect the full business bargain of the participants.

O'Neal, *supra*, at 886.

After articulating the "rights or interests" of the complaining shareholder, the trial court is then to determine if liquidation is

"reasonably necessary" for the protection of those "rights or interests." Although a literal reading of N.C.G.S. § 55-125(a)(4) would suggest that liquidation is the only relief which may be given if a remedy is "reasonably necessary" for the protection of the shareholder's "rights or interests," this is not the case. This statute granting trial courts the power to dissolve a corporation is not to be read in isolation. Under N.C.G.S. § 55-125.1, the trial court is given the power to order alternative forms of relief for actions brought under N.C.G.S. § 55-125(a). N.C.G.S. § 55-125.1 provides as follows:

(a) In any action filed by a shareholder to dissolve the corporation under G.S. 55-125(a), the court may make such order or grant such relief, other than dissolution, as in its discretion it deems appropriate, including, without limitation, an order:

(1) Canceling or altering any provision contained in the charter or the bylaws of the corporation; or

(2) Canceling, altering, or enjoining any resolution or other act of the corporation; or

(3) Directing or prohibiting any act of the corporation or of shareholders, directors, officers or other persons party to the action; or

(4) Providing for the purchase at their fair value of shares of any shareholder, either by the corporation or by other shareholders, such fair value to be determined in accordance with such procedures as the court may provide.

(b) Such relief may be granted as an alternative to a decree of dissolution, or *may be granted whenever the circumstances of the case are such that relief, but not dissolution, would be appropriate.* (1973, c. 496, s. 41.)

(Emphasis added.)

Thus, when an action is brought under N.C.G.S. § 55-125(a)(4), the trial court is to examine all of the following possibilities: 1) whether, under N.C.G.S. § 55-125(a)(4) *liquidation* is reasonably necessary; 2) whether, under N.C.G.S. § 55-125.1(a)(1)-(4), *any of the four listed alternatives* are more appropriate than liquidation;

3) whether, under N.C.G.S. § 55-125.1(b), *any other "alternative" relief* is more appropriate than dissolution; or 4) whether, under N.C.G.S. § 55-125.1(b), *any other "alternative" relief, but not dissolution,* is appropriate. As noted, N.C.G.S. § 55-125.1(b) provides that the trial court has the authority to grant any other alternative relief whenever such relief, *but not dissolution,* is appropriate. It is clear, then, that when N.C.G.S. § 55-125(a)(4) and 55-125.1(b) are read in conjunction, it must only be "established" under N.C.G.S. § 55-125(a)(4) that *relief of some kind,* and not just liquidation, is "reasonably necessary" for the protection of the complaining shareholder's "rights or interests." To interpret N.C.G.S. § 55-125(a)(4) as providing that relief can be given only when *liquidation* is "reasonably necessary" for the protection of the complaining shareholder's "rights or interests" would, in effect, fail to recognize the existence of N.C.G.S. § 55-125.1(b) to the extent that it grants trial courts the power to order alternative relief where relief of some kind *but not dissolution* is appropriate.[4]

In sum, therefore, we hold that under N.C.G.S. § 55-125(a)(4) a trial court is: (1) to define the "rights or interests" the complaining shareholder has in the corporation; and (2) to determine whether some form of relief is "reasonably necessary" for the protection of those "rights or interests." For plaintiff to obtain relief under the expectations' analysis, he must prove that (1) he had one or more substantial reasonable expectations known or assumed by the other participants; (2) the expectation has been frustrated; (3) the frustration was without fault of plaintiff and was in large part beyond his control; and (4) under all of the circumstances of the case, plaintiff is entitled to some form of equitable relief.

IV.

[2]　We will now review the "rights or interests" each party contends Michael has in the family corporations. Michael suggests in his brief that the "rights or interests" he has as a shareholder in

---

4. We are aware that, strictly speaking, the terms "liquidation" and "dissolution" are not identical terms of art. However, N.C.G.S. § 55-125.1(a) refers to actions brought under N.C.G.S. § 55-125(a) as actions to "dissolve" the corporation, even though N.C.G.S. § 55-125(a) literally grants trial courts the power to "liquidate" the assets and business of a corporation. Thus, we are interpreting the two terms, for purposes of this opinion, as synonyms in the broad sense that they connote termination of a corporation's existence.

these close corporations include "rights or interests" in secure employment, fringe benefits which flow from his association with the corporations, and meaningful participation in the management of the family business. As noted above, several commentators have suggested that the "reasonable expectations" of shareholders in close corporations often include some of these same "rights or interests." Afterman, *supra*, at 1064; O'Neal, *supra*, at 885; Comment, *Deadlock and Dissolution, supra*, at 795; Comment, *Dissolution Under the California Corporations Code, supra*, at 616; Comment, *Oppression, supra*, at 141. Further, Michael indicates that these "rights or interests" are in need of protection: Michael was fired from his job after suing his brother; his fringe benefits were terminated at that time as well; he has been "systematically" excluded from any meaningful participation in management decisions apparently since the inception of the management contract between Eastern Federal and Republic.

Defendants argue, however, that Michael, as a shareholder, is only entitled to relief if his traditional shareholder rights have been infringed. They contend that those traditional shareholder rights include the right to notice of stockholders' meetings, the right to vote cumulatively, the right of access to the corporate offices and to corporate financial information, and the right to compel the payment of dividends. Because these rights have not been violated, they argue, Michael is not entitled to relief. Indeed, defendants contend that the dividends distributed to Michael have been generous.[5]

While it may be true that a shareholder in, for example, a publicly held corporation may have "rights or interests" defined as defendants argue, a shareholder's rights in a closely held corporation may not necessarily be so narrowly defined. In short, we hold that the shareholder in this case — one who owns stock worth well over $3,000,000 and which accounts for a 30 to 40 percent ownership in these closely held, family-run corporations worth well over $11,000,000 and who also has been employed by the corporations, provided with fringe benefits, and, to some extent, allowed to participate in management decisions — has "rights or interests" more broadly defined than defendants contend. Put

---

5. From 1951 until 1976 Michael received no dividends. In 1977, he received $1,603.69; in 1978 he received $41,693.05; in 1979 he received $54,591.08; and in 1980 he received $61,845.36.

another way, Michael's "reasonable expectations" are not as limited as defendants contend.

Again, we note that N.C.G.S. § 55-125(a)(4) speaks in terms of the "rights or interests" of *the complaining shareholder.* Thus, those "rights or interests" must be defined with reference to the "rights or interests" the complaining shareholder has under the facts of the particular case—the "reasonable expectations" the participants' relationship has generated. Indeed, the legislature would not have had reason to enact N.C.G.S. § 55-125 (a)(4) if "rights or interests" were to always comprise only the traditional shareholder rights: other statutes already address the traditional rights and remedies to which shareholders have been entitled. *See e.g.,* N.C.G.S. § 55-62(a) (notice of shareholder's meetings); N.C.G.S. § 55-67(c) (right to cumulative voting); N.C.G.S. § 55-37(a)(4) and N.C.G.S. § 55-38(b) (right to examine books and records); and N.C.G.S. § 55-50(1) and (m) (right to compel payment of dividends).

Our task at this juncture, then, is to determine, in light of each party's contentions and the analysis articulated above that is to be applied to suits brought under N.C.G.S. § 55-125(a)(4), whether the trial court made appropriate findings of fact.[6] Specifically, we must determine whether the trial court defined the "rights or interests" Michael does have in these family-run corporations, and whether it determined that some form of relief is "reasonably necessary" to protect those particular "rights or interests."

In denying Michael's claim for relief, the trial court made the following findings of fact:

A. The corporate philosophy of all the defendants has remained the same under Ira S. Meiselman as it was under H. B. Meiselman, to wit, a "pay as you go" or conservative approach to business management.

6. Defendants argue that because Michael failed to specifically except to each finding of fact the trial court made, a violation of Rule 10(b)(2), N. C. Rules App. Proc., this Court should not review the trial court's findings. Although we agree that Michael did not adhere to this procedural rule, we will overlook this failure in order "to expedite decision in the public interest," Rule 2, N. C. Rules App. Proc. We are aware that guidance from this Court is needed in this, as yet, uncharted area of corporate law.

B. The record is silent and there is an absence of evidence (indeed, there is no cross examination by plaintiff) direct or on cross nor any suggestion that corporate financial policy has resulted in any inequities to minority stockholder Michael H. Meiselman.

C. There is no evidence of unexplained:

1. Increases of salaries of corporate officers including Ira S. Meiselman;

2. Increase in corporate reserves such as depreciation, capital improvement or any other reserve;

3. Changes in dividend policy to the detriment of the minority stockholder;

4. Retention of earnings (an area closely monitored by IRS) to the detriment of the minority stockholder, Michael H. Meiselman;

5. Purchases of assets to obtain long term appreciation of asset values for the benefit of second-generation heirs.

D. There is no evidence of bad faith or the adoption of unduly expansive growth requiring capital outlays to the detriment of the majority or minority stockholders.

E. H. B. Meiselman did not subscribe or resort to long-term debt assumption for the purpose of financing growth projects, and this policy has remained unaltered.

F. The management of these companies has resulted in a ten-year growth from 1968 to 1978 in book value of the minority shareholder's equity of $2,500,000.00; such book value increased further in 1979.

G. There is a lack of evidence to support a finding of fact that personal differences between the majority and minority stockholders have in any way influenced corporate policy, financial or otherwise; and to the contrary the record indicates that objections by minority stockholder, Michael H. Meiselman, apparently motivated the corporations and the individual defendants to:

Meiselman v. Meiselman

1. Abandon a merger; and

2. Terminate a management agreement between Republic Management Corporation and Eastern Federal Corporation.

H. There is no evidence to support a finding of fact that there was oppression, overreaching on the part of management, the taking of any unfair advantage of the minority stockholder by the majority stockholder or any other wrongful conduct on the part of the majority stockholder, Ira S. Meiselman.

I. In the absence of gross abuse or the taking of gross unfair advantage by the majority stockholder, the Court's exercise of discretion to require a sale would be, as a practical matter, difficult to effectuate.

1. Book value is not the same as market value.

2. The shares of a closely held corporation are not marketable generally.

3. If the businesses are to continue, ordinarily a majority stockholder would prefer to pay a premium to avoid an uncooperative holder of the outstanding shares.

J. There is no deadlock in the management of the corporate affairs of any defendant corporation.

K. There is no evidence of the financial ability of or the appropriateness of any other individual stockholder purchasing the shares of Michael Meiselman.

We note that the findings set out above do not address or define the "rights or interests" Michael has in these close corporations. It appears that the trial court focused instead on any possible egregious wrongdoing on Ira's part. For example, the trial court found, in part, that there is "no evidence to support a finding of fact that there was oppression, overreaching on the part of management, the taking of any unfair advantages of the minority stockholder by the majority stockholder or any other wrongful conduct on the part of the majority stockholder, Ira S. Meiselman." Further, the trial court found that there is an "absence of gross abuse or the taking of gross unfair advantage . . ." and that there is "no evidence of bad faith . . . to the detri-

ment of the majority or minority stockholders." These findings indicate that the trial court applied incorrect legal standards in determining whether Michael was entitled to relief under N.C.G.S. § 55-125(a)(4). Under the analysis this Court articulated above, the trial court is to focus instead on the "rights or interests" the complaining shareholder has in the corporation and whether those "rights or interests" are in need of protection. The trial court's use of the standards of "oppression," "overreaching," "gross abuse," "unfair advantage," and the like with respect to Ira's actions was erroneous. This error is understandable, however, since at that time this Court had not articulated the analysis to be applied in suits brought under N.C.G.S. § 55-125(a)(4).

Because the trial court's findings of fact failed to address the "rights or interests" Michael has in these family corporations, we must remand the case to the trial court for an evidentiary hearing to resolve this issue. On remand, after hearing the evidence, the trial court is to: (1) articulate specifically Michael's "rights or interests" — his "reasonable expectations" — in the corporate defendants; and (2) determine if these "rights or interests" are in need of protection, and, thus, that relief of some sort should be granted. In addition, the trial court is to prescribe the form of relief which the evidence indicates is most appropriate, should it find that relief is warranted. In remanding this case for an evidentiary hearing and new findings, we need not address the issue of whether the trial court abused its discretion in refusing to grant relief to Michael.

V.

[3] Michael also contends that Ira breached the fiduciary duty he owes as a director and officer of the corporate defendants through his sole ownership of the stock in Republic, the corporation with which Eastern Federal contracted to provide management services. Michael concedes that the trial court was correct when it found that the management contract between Republic and Eastern Federal was just and reasonable at the time it was executed. He states that he has "never complained about Republic management itself nor about the management contract." It is only Ira's sole ownership of the stock in Republic to which he objects.

In essence, then, Michael is claiming that Ira breached his fiduciary duty to the corporate defendants by usurping a corporate opportunity which belonged to them—the opportunity to buy the stock of Republic. Having thus framed Michael's claim that Ira breached his fiduciary duty to the corporate defendants as one involving a usurpation of a corporate opportunity, we will first set out the rules governing this area of the law before examining the trial court's finding of fact to determine if it adequately addressed this issue.

In order for plaintiff to succeed in this claim, he must prove that (a) he has standing as a shareholder in the corporate defendants to bring suit on this claim against Ira as a director and officer of the defendant corporations, and (b) Ira, in his role as a corporate director and officer, breached a fiduciary duty owed to the corporate defendants not to usurp a corporate opportunity of the corporate defendants.

It appears that this Court has alluded to the "corporate opportunity doctrine" in only one instance. In *Brite v. Penny*, 157 N.C. 110, 72 S.E. 964 (1911), this Court stated that "[t]he law would not permit him [a corporate officer] to act in any such double capacity to appropriate business for himself belonging legitimately to his corporation and to reap the profits of it. Good faith to the stockholders forb[ids] it." *Id.* at 115, 72 S.E. at 966. This Court apparently has not addressed the doctrine of corporate opportunity since that time. Therefore, in articulating the rules which should be applied in this area of the law, we will first examine the rules other courts have adopted.

The doctrine of corporate opportunity is "a species of the duty of a fiduciary to act with undivided loyalty; it is one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relations with the corporation that he represents; in general, a corporate officer or director is under a fiduciary obligation not to divert a corporate business opportunity for his own personal gain." Annot., 77 A.L.R. 3d 961, 965 (1977). Stated more simply, the "corporate opportunity doctrine provides that a corporate fiduciary may not appropriate to himself an opportunity that rightfully belongs to his corporation." Note, *Corporate Opportunity and Corporate Competition: A Double-Barreled Theory of Fiduciary Liability*, 10 Hofstra L. Rev.

1193 (1982) [hereinafter cited as Note, *Corporate Opportunity*], citing *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 271-73, 5 A. 2d 503, 510-11 (1939).

In *Guth v. Loft, Inc., supra,* a leading case in this area of the law, the Supreme Court of Delaware articulated the corporate opportunity doctrine as follows:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

23 Del. Ch. at 270, 5 A. 2d at 510.

Generally speaking, there are three types of business opportunities a corporate fiduciary can attempt to take advantage of: "those entirely extraneous to the corporation's business, those in the same or a direct line with it, and finally, those complementary to it." Note, *Liability of Directors for Taking Corporate Opportunities, Using Corporate Facilities, or Engaging in a Competing Business,* 39 Colum. L. Rev. 219, 220 (1939). The courts have formulated three tests to differentiate between an extraneous opportunity and those upon which a corporation would wish to act. *See e.g.,* Note, *Corporate Opportunity, supra,* at 1196. The first test focuses on whether the corporation had an "interest or expectancy" in the opportunity. *Id.* at 1196-97. The second test considers

whether the opportunity was within the corporation's "line of business." *Id.* at 1197. The third test asks whether considerations of "fairness" indicate that the opportunity is one which belonged to the corporation. *Id.* We find it unnecessary to label the North Carolina test because the General Assembly, in its wisdom, has enacted a statutory standard, N.C.G.S. § 55-30(b). The specific part of that statute applicable to this case, N.C.G.S. § 55-30(b)(3) provides as follows:

> (b) No corporate transaction in which a director has an adverse interest is either void or voidable, if:
>
>     . . .
>
>     (3) The adversely interested party proves that the transaction was just and reasonable to the corporation at the time when entered into or approved. In the case of compensation paid or voted for services of a director as director or as officer or employee the standard of what is "just and reasonable" is what would be paid for such services at arm's length under competitive conditions.

In support of his contention that Ira's sole ownership of the stock in Republic constitutes a breach of the fiduciary duty Ira owes the corporate defendants, Michael cites *Highland Cotton Mills v. Ragan Knitting Co.*, 194 N.C. 80, 138 S.E. 428 (1927), for the proposition that Ira's "liability has now been conclusively established because of the well-settled rule in North Carolina that a transaction between a corporation and its directors or officers is presumed to be invalid unless those seeking to sustain it prove that it was 'just and reasonable.'" This presents the question as to whether the common law rule stated in *Highland Cotton Mills* is a rule substantially different from that set out in N.C.G.S. § 55-30(b)(3). We hold that the two standards are the same. Under both N.C.G.S. § 55-30(b)(3) and this Court's holding in *Highland Cotton Mills* the adversely interested party must demonstrate that the transaction at issue was "just and reasonable."[7] Thus,

---

7. We note that in his excellent treatise on North Carolina corporate law, Russell Robinson, Michael's lawyer in this case, does indeed cite *Highland Cotton Mills* for the common law rule that a "transaction between a corporation and its directors or officers is presumed to be invalid so that those seeking to sustain it

once an adversely interested party proves that the transaction at issue was "just and reasonable to the corporation at the time when entered into or approved," N.C.G.S. § 55-30(b)(3), it follows that the interested party has satisfied its burden under this Court's decision in *Highland Cotton Mills.*

In essence, then, when an officer or director is charged with having usurped a corporate opportunity, he or she must establish under N.C.G.S. § 55-30(b)(3) that the "corporate transaction" in which he or she has engaged is "just and reasonable" to the corporation because it was not an opportunity or "corporate transaction" which the corporation itself would have wanted. A determination of what is "just and reasonable" and, thus, whether a corporate opportunity has indeed been usurped, is, of course, one in which "no hard and fast rule can be formulated." *See Guth v. Loft, Inc., supra,* 23 Del. Ch. at 270, 5 A. 2d at 510.

As one commentator noted, the courts determine whether a corporate opportunity has been usurped by examining the facts of each particular case. Comment, *The Corporate Opportunity Doctrine,* 18 Sw. L.J. 96, 100 (1964). However, some of the "recurring circumstances" which courts continually find relevant in determining whether a corporate opportunity has been usurped include the following: 1) the ability, financial or otherwise, of the corporation to take advantage of the opportunity; 2) whether the corporation engaged in prior negotiations for the opportunity; 3) whether the corporate director or officer was made aware of the opportunity by virtue of his or her fiduciary position; 4) whether the existence of the opportunity was disclosed to the corporation; 5) whether the corporation rejected the opportunity; and 6) whether the corporate facilities were used to acquire the opportunity. *Id.* at 100-107.

In attempting to give substance to its fiduciary duty standard in this area, the Delaware Supreme Court set out in *Guth* sev-

must prove that it was openly and fairly made." R. Robinson, *North Carolina Corporation Law and Practice* § 12-11, at 184 (3d ed. 1983). Immediately after setting out this common law rule, however, Mr. Robinson then suggests, in citing N.C.G.S. § 55-30(b), that the "Business Corporation Act now purports to clarify this frequently uncertain area of the law." *Id.* In a footnote he writes that "[t]he purpose of [N.C.G.S. § 55-30(b)] was stated by the General Statutes Commission as follows: 'To attempt to clarify the largely-uncodified law relating to interested directors, and in particular to define areas of validity.'" *Id.* at 186, n. 6.

eral circumstances under which a corporate director or officer will be deemed to have appropriated for him or herself an opportunity rightfully belonging to the corporation:

[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

23 Del. Ch. at 272-73, 5 A. 2d at 511.

In taking into account the fact that a corporate opportunity may arise not only in the same or direct line with a corporation's business, but also in a line complementary to it, we hold that in determining whether a corporate fiduciary had usurped a corporate opportunity — and thus that the "corporate transaction" in which he or she has entered is not "just and reasonable" to the corporation — a trial court is to approach the problem from two perspectives. It is to examine not only whether the disputed opportunity is functionally related to the corporation's business, but also whether the corporation has an interest or expectancy in the opportunity. In so doing, the trial court is to examine all of the facts in the particular case, including the "recurring circumstances" other courts have found relevant, in determining whether a corporate opportunity has indeed been usurped.

We turn now to the findings of fact the trial court made to support its conclusion of law that there had been "no actionable breach of fiduciary responsibility by any of the defendants."

The trial court made the following seven findings of fact:

A. The name of Republic Management Corporation was selected by H. B. Meiselman;

B. The elder Meiselman (H. B. Meiselman) had a management corporation involved in his business dealings for a number of years prior to the chartering of Republic Management Corporation;

C. The evidence is silent as to any bad faith exercised by Ira S. Meiselman in connection with the management company, and this Court makes this finding with full knowledge that Ira S. Meiselman signed the management agreement in his capacity as chief executive officer of the defendant corporations and as President of Republic Management Corporation;

D. Republic Management Corporation has retained earnings resulting from the management contract in the approximate amount of $61,000.00 covering a period of time of some five years, which earnings reached a peak in 1974 of $57,000.00 and plunged to a loss of $11,000.00 in 1975;

E. The uncontradicted evidence shows that virtually all of the retained earnings were accumulated during the exceptionally good years of 1973 and 1974 and that the corporation has since that time suffered losses of approximately $10,000.00 for which Republic Management Corporation has not sought reimbursement;

F. The plaintiff himself received salary from Republic Management Corporation, a company in which he has no equity and for which he has provided no compensable work;

G. The management contract between Republic Management Corporation and defendant Eastern Federal Corporation was just and reasonable at the time it was executed.

The above findings do not address the issue of whether Ira usurped a corporate opportunity from the corporate defendants. Although we agree with the Court of Appeals' determination that "[i]t does not matter that Republic was a successor to previous management companies which performed management services for the defendant corporations," *Meiselman v. Meiselman, supra,* 58 N.C. App. at 774, 295 S.E. 2d at 259, the *identity of the shareholders* who owned the successor corporations may be crucial in determining if Ira usurped a corporate opportunity with his purchase for himself of all of the stock in Republic.

We also agree with the Court of Appeals in its holding that the trial court based its conclusion that there was no actionable breach of fiduciary responsibility, in part, upon what was "in reality, a conclusion of law," that is, that the "management con-

tract between Republic Management Corporation and defendant Eastern Federal Corporation was just and reasonable at the time it was executed." *Id.* at 775, 295 S.E. 2d at 259-60. At any rate, Michael concedes that the trial court was correct in this "finding." However, as Michael contends in his brief, the fairness of the contract is not at issue. The "corporate transaction" at issue here is not Ira's and the other director's execution of a management contract between Republic and Eastern Federal. Rather, the "corporate transaction" in which Ira has an "adverse interest" as an officer and director of Eastern Federal and the other corporate defendants, is his purchase for himself of all of the stock in Republic, a corporation which stands to benefit from profits produced as a result of a management contract it is to perform for Eastern Federal. Thus, the trial court failed to focus on the appropriate issue here. In so doing, its findings of fact necessarily failed to address the appropriate issue as well. Thus, we must remand this case to the Court of Appeals to be remanded to the trial court for further findings. In making its findings, the trial court must determine whether the opportunity to purchase the stock in Republic rightfully belonged to the corporate defendants rather than to Ira personally. In so doing, the trial court will examine the facts and decide if the corporate defendants would have had an interest or expectancy in purchasing all of the shares of stock in a corporation whose sole function appears to be the management of the Meiselman family business. It also is to determine whether Ira's acquisition of all of the stock in this type of corporation is an activity functionally related to those of the corporate defendants. Under either approach, the trial court may find that Ira usurped a business opportunity which rightfully belonged to the corporate defendants.

## VI.

In sum, therefore, we hold that the order of the trial court denying plaintiff's claim for relief under N.C.G.S. § 55-125(a)(4) and N.C.G.S. § 55-125.1 must be vacated. Thus, we affirm the decision of the Court of Appeals on this issue, but modify it to the extent its analysis under N.C.G.S. § 55-125(a)(4) and N.C.G.S. § 55-125.1 is not in conformance with the analysis this Court has articulated herein. We also affirm the decision of the Court of Appeals to the extent it held that the trial court erred in determining Ira Meiselman had not breached the fiduciary duty he owed to

the corporate defendants through his sole ownership of the stock in Republic. The case is remanded to the Court of Appeals for remand to the Superior Court, Mecklenburg County, for further proceedings consistent with this opinion.

Modified, affirmed and remanded.

Justice MARTIN concurring in the result.

Except as herein set forth, I concur in the majority opinion. There are, however, certain aspects of the case that should be discussed that the majority does not address.

In determining whether plaintiff's expectations have been frustrated, the actions of all the participants, including plaintiff, must be considered. The majority fails to address this aspect of the case. In *Exadaktilos v. Cinnaminson Realty Co.*, 167 N.J. Super. 141, 400 A. 2d 554 (1979), *aff'd*, 173 N.J. Super. 559, 414 A. 2d 994 (1980), plaintiff acquired a twenty percent interest in a corporation that operated a restaurant. He expected to learn the restaurant business and participate in management. Unfortunately, he did not get along with the other employees and stockholders and was fired for what the court viewed as "unsatisfactory performance." In deciding plaintiff's claim for relief, the court considered the propriety of the actions by the controlling shareholders. The court found that the opportunity had been offered plaintiff and it was lost through *no fault* of the defendants. In weighing plaintiff's claim against the disruptive effects the grant of relief would have upon the business, the court found it appropriate to consider the actions of all parties in determining the cause of the frustration of plaintiff's expectations.

The approach in *Exadaktilos* is appropriate under the law of North Carolina. The statute itself, N.C.G.S. 55-125.1(b), provides relief may be granted "whenever the circumstances of the case are such that relief, but not dissolution, would be appropriate." This mandates a consideration and balancing of all the circumstances of the case in determining whether relief should be granted and, if so, the extent, nature and method of such relief.

This Court forecast this procedure in *Dowd v. Foundry Co.*, 263 N.C. 101, 139 S.E. 2d 10 (1964), a case involving N.C.G.S. 55-125 (a)(4). We stated: "We are not required, at this stage, to de-

termine to what extent the interests of other shareholders may be balanced against those of one complaining shareholder who seeks liquidation and dissolution." The clear holding of *Dowd* is that the interests of the other shareholders must be considered and balanced against those of the complaining shareholder in determining whether to grant relief and, if so, the nature, extent and method of relief. This principle should be applied in the present appeal.

The decision whether to grant the statutory relief involves equity and the discretionary power of the court. *Id.* "Equity cannot permit itself to be used by a stockholder who simply wishes to get out of a bad bargain . . . ." Hornstein, *A Remedy for Corporate Abuse—Judicial Power to Wind Up a Corporation at the Suit of a Minority Shareholder,* 40 Col. L. Rev. 220, 235 (1940). *Cf. Jackson v. Nicolai-Neppach Co.,* 219 Or. 560, 348 P. 2d 9 (1959) (plaintiff has burden of proving equitable grounds for relief).

Another factor to be considered by the court in determining whether to grant relief is whether the minority shareholder has diligently pursued all of the other available statutory means for the protection of his rights and that after doing so "[l]iquidation [or alternative relief under N.C.G.S. 55-125.1] is reasonably necessary for the protection of [his] rights or interests . . . ." N.C. Gen. Stat. § 55-125(a)(4) (1982). *See Murphy v. Greensboro,* 190 N.C. 268, 129 S.E. 614 (1925). The majority shareholders and the corporation should not be subject to dissolution, the most drastic form of relief available, where other statutory rights may provide an adequate remedy for the minority shareholder. This is in accord with the general rule that equitable relief will not ordinarily be granted when plaintiff has an adequate remedy at law. *A.E.P. Industries v. McClure,* 308 N.C. 393, 302 S.E. 2d 754 (1983). Such statutory rights include, e.g., the minority's right to attempt to gain representation on the board of directors under N.C.G.S. 55-25 and the right to compel the payment of dividends under N.C.G.S. 55-50.

In determining whether to grant equitable relief under N.C.G.S. 55-125.1, the trial court must consider all the circumstances of the case. If it is determined that plaintiff's rights or interests require protection because of plaintiff's own conduct, it would be improper to grant equitable relief. He who seeks

equity must do equity. *Transit, Inc. v. Casualty Co.*, 285 N.C. 541, 206 S.E. 2d 155 (1974); *Roberson v. Pruden*, 242 N.C. 632, 89 S.E. 2d 250 (1955); Hillman, *The Dissatisfied Participant in the Solvent Business Venture: A Consideration of the Relative Permanence of Partnerships and Close Corporations*, 67 Minn. L. Rev. 1 (1982). The reasons *why* the complaining shareholder's interests require protection is highly relevant in the resolution of the case.

The court should also consider what effect the granting of relief will have upon the corporation and other shareholders. Will it interfere with the corporation's ability to attract financing for its business? Will it interfere with its ability to attract additional capital? Will it require burdensome financing upon the corporation or the shareholders? Will it interfere with the rights of creditors? If a buy-out of plaintiff's shares is forced upon the company, it may be far from painless. If it is determined that the granting of relief will be unduly burdensome to the corporation or other shareholders, the trial court should consider this in determining whether to grant relief and, if so, whether this should affect the purchase price or value attached to plaintiff's shares or the method of payment. It is an equitable proceeding. *Dowd v. Foundry Co., supra,* 263 N.C. 101, 139 S.E. 2d 10.

Another circumstance to be considered is whether plaintiff's condition is a result of oppression or bad conduct by the other shareholders. Oppression for these purposes may be defined as: burdensome, harsh and wrongful conduct; a lack of fair dealing in the affairs of the company to the detriment of other shareholders; a violation of fair play on which every shareholder is entitled to rely. *See, e.g., Exadaktilos, supra; White v. Perkins*, 213 Va. 129, 189 S.E. 2d 315 (1972). In making this determination, the court will consider the substance of the conduct rather than its form. *Polikoff v. Dole & Clark Building Corp.*, 37 Ill. App. 2d 29, 184 N.E. 2d 792 (1962).

Oppression in this context is close to a breach of fiduciary duty. The West Virginia Supreme Court, in a "reasonable expectations" case, analyzed oppression from the point of view of breach of a fiduciary duty. It held in substance that oppressive conduct in a close corporation is closely related to the fiduciary duty of good faith and fair dealing owed by majority stockholders to minority stockholders. *Masinter v. Webco Co.*, 262 S.E. 2d 433

(W. Va. 1980). *See also, Fox v. 7L Bar Ranch Co.*, 645 P. 2d 929 (Mont. 1982).

In this connection, I cannot agree that merely because plaintiff's expectations were not fulfilled it necessarily follows that the majority stockholders were guilty of oppression.

Another circumstance to be considered is the fact that most, if not all, of plaintiff's stock was given to him by his father. He did not contribute his own hard-earned cash to the enterprise. This could indicate that he did not assume the risk of having his investment held hostage by the majority, or it could be that one has to accept what one gets by gift—in this case, a locked-in minority interest in a family corporation.

With respect to the Republic management issue, in order for plaintiff to succeed, he must prove that (a) he has standing as an Eastern shareholder to bring suit on this claim against Ira as an Eastern director and officer, and (b) Ira in his role as an Eastern director and officer breached a fiduciary duty owed to Eastern not to usurp a corporate opportunity of Eastern. To establish the usurpation of a corporate opportunity, plaintiff must prove that: (1) the opportunity was either essential to the corporation or was one in which it had an interest or expectancy; (2) the corporation was financially able to take advantage of the opportunity itself; and (3) the party charged with usurping the opportunity did so in an official rather than an individual capacity. Upon such showing, the burden shifts to the defendant to prove the entire fairness of the transaction and that it was free from oppression, imposition and actual or constructive fraud. *Thompson v. Shepherd*, 203 N.C. 310, 165 S.E. 796 (1932); *Schreiber v. Bryan*, 396 A. 2d 512 (Del. Ch. 1978). *See generally* 56 Nw. U. L. Rev. 608 (1961); 16 A.L.R. 4th 784 (1982).

The foregoing are additional circumstances the trial judge should consider in determining the reasonable expectations of plaintiff and whether to grant equitable relief to plaintiff and, if so, the nature and method of such relief. They are required by the "circumstances of the case" standard of N.C.G.S. 55-125.1(b), the rules governing the exercise of discretionary power by the trial judge, N.C.G.S. 55-125.1(a), and the rules for granting equitable relief, and they are supported by *Dowd v. Foundry Co.*,

*supra,* 263 N.C. 101, 139 S.E. 2d 10. *See generally Dissatisfied Participant, supra.*

Chief Justice BRANCH and Justice COPELAND join in this concurring opinion.