CROWDER CONSTRUCTION COMPANY v. EUGENE P. KISER

No. COA98-949

(Filed 20 July 1999)

### 1. Corporations— stock buyout agreement—determination of adjusted book value

The trial court did not err by granting summary judgment for plaintiff in an action to force specific compliance with a stock buyout agreement against a terminated employee. Where the value of a closely held corporation is determined by the use of its balance sheet as directed by a buyout agreement and is calculated by the accounting firm normally servicing that corporation in accordance with the terms of the agreement, the value determined by that accounting firm is presumptively correct in the absence of mathematical error, fraud, or evidence of a failure to follow generally accepted accounting practices.

### 2. Corporations— stock buyout agreement—unconscionability

The trial court did not err by granting summary judgment for plaintiff in an action to force compliance with a stock buyout agreement against a terminated employee where defendant contended that enforcement of the agreement would be unconscionable. A trial court may decline to specifically enforce a stock restriction agreement entered into pursuant to N.C.G.S. § 55-6-27 if there has been a change of circumstances since the execution of the agreement such that enforcement would be unconscionable under the particular circumstances, using the settled definition of unconscionability from contract law. Plaintiff here forecast a reasonable business purpose in terminating defendant, and there was no showing by defendant that his discharge was for a wrongful purpose, even assuming that defendant was promised that he would not be prematurely discharged in order to deprive him of the full value of his stock. Finally, defendant freely entered into the agreement which set out the adjusted book value he now contests as unconscionable.

### 3. Corporations— stock buyout agreement—timing of tender

The trial court did not err by granting summary judgment for plaintiff in an action to enforce a stock buyout agreement against a terminated employee where the employee, defendant, argued that he was not required to immediately tender his stock options

and that he could wait until the options were fully vested. The agreement's 90-day closing period expressed the parties' intent; moreover the adjusted book value was to be determined by reference to plaintiff's financial statement at the end of its last fiscal year prior to the date of defendant's termination.

### 4. Corporations— stock buyout agreement—unconscionability—change in tax reporting

The trial court did not err by granting summary judgment for plaintiff in an action to enforce a stock buyout agreement against a terminated employee where the employee contended that a company decision to take a business expense deduction based on a loss arising from employee stock options caused defendant to incur a tax liability and made the stock purchase agreement unconscionable. The Court of Appeals declined to rewrite the buyout agreement; furthermore, defendant was not prejudiced by plaintiff's decision.

Appeal by defendant from order entered 10 March 1998 by Judge Ben F. Tennille in Mecklenburg County Superior Court. Heard in the Court of Appeals 10 May 1999.

Plaintiff Crowder Construction Company (plaintiff, or Company), a closely held North Carolina corporation, seeks to enforce a stock restriction and buy-out agreement against Eugene P. Kiser (defendant, or Kiser), who is a former employee and corporate officer of plaintiff. Defendant pleads a number of equitable defenses to the enforcement of the agreement, and further contends that the value of his shares of Company stock were not calculated correctly.

Crowder Construction Company was founded in the 1940's by O.P. and W.T. Crowder, Sr., and was incorporated as a North Carolina corporation on 28 May 1953. Stock in the Company has always been closely held by members of the Crowder family and by certain key employees. Since at least 1955, a shareholders' restriction agreement has provided that shareholders who wish to sell their shares of stock in the Company must first offer the shares to the Company at a price based on the book value of the shares. The various shareholders' agreements have also included a "buy-out" provision requiring that the Company purchase the shares of stock at book value (later, adjusted book value), except for those shares obtained by employees pursuant to stock option agreements. As to shares obtained pursuant to stock options, the Company has the first option to purchase those

shares, but is not required to do so. Kiser is a certified public accountant (CPA) who was hired by Crowder in 1981 as its corporate Controller. Kiser was elected Vice-President of Finance (later, Chief Financial Officer) and Corporate Secretary in or about 1985, and served in those capacities until his discharge in 1995.

In 1986, the Company developed a stock option plan for key employees. Those employees, including Kiser, were allowed to purchase Crowder stock at $7.00 per share, a substantial discount from the then book value of $31.83 per share. Kiser purchased 2,000 shares under the 1986 plan, an investment of $14,000.00. In 1988, a second stock option plan was adopted. Again, Kiser and other key employees were allowed to purchase Crowder stock at $7.00 per share, again a substantial discount from the book value of $44.83 per share. Kiser purchased 4,750 shares of Company stock at $7.00 per share, for a total investment of $33,250.00. Both stock option plans included a paragraph entitled "Stock Restriction Agreement" which provided that any shares of stock issued pursuant to a stock option plan were subject to the terms of any stock restriction agreement in effect on the date of the stock's issuance.

At the time of the issuance of the optioned shares to Kiser in 1986 and again in 1988, the shareholders' agreements in effect on both dates provided that, if the employment of a shareholder with the Company was terminated "for any reason whatsoever, [the employee] shall offer his shares to the Corporation and the Corporation shall purchase his shares at the price provided [by the formula set out in the agreement]."

Both plans also provided a mechanism for valuation of the stock, and each provided that in order for an employee to receive full book value for his shares, the employee must have maintained an employment relationship with the corporation for at least seven years since the issuance of the stock to the employee pursuant to the stock option plans. A third stock option plan was adopted in 1990, but Kiser purchased no stock under the 1990 plan. In 1991, all shareholders, including Kiser, executed a Revised and Restated Stock Restriction and Purchase Agreement (the 1991 Agreement), superseding all previous agreements. The 1991 Agreement provided in pertinent part that a terminated Company shareholder must offer his shares of stock to the Company, and the Company must purchase the shares at a price determined by use of a formula set out in the agreement. For employees whose shares were not issued pursuant to the provisions

of a Stock Option Agreement, the "price to be paid . . . [was] 100% of adjusted book value at the date of the offer to sell."

The 1991 Agreement further provided that, if the employee's shares had been issued pursuant to the 1986 Stock Option Plan, and had been issued for more than seven years prior to the date of termination, the purchase price was to be "100% of the adjusted book value at the time of the offer to sell." The "adjusted book value" was to be determined by the "certified public accountant then servicing the Corporation," by adjusting the net book value per share at the end of the Company's last fiscal year in order to account for funds to be disbursed to shareholders to cover their tax liability resulting from the Company's Subchapter S status, and to reflect the "Corporation's use of the completed contract or percentage of completion method of accounting, or the use of LIFO or FIFO accounting or similar timing adjustments."

In the case of shares issued pursuant to the 1988 option agreement, and held by an employee less than seven years at the time of termination of the employee's employment with the Company, the 1991 Agreement set out the following formula for determining the price to be paid the terminated employee for those shares:

D. The purchase price per share of any shares which were originally issued by the Company as a result of the exercise of a stock option granted under the 1988 [S]tock Option Plan shall be determined as follows:

  1. If the stock has been issued for less than seven years, the price shall be 7:00 [*sic*], plus the amount, if any, by which the adjusted book value per share at the date of the offer to sell exceeds $44.83. If, at the date of the offer, the adjusted book value per share is less than $44.83, the purchase price shall be $7.00, less the amount by which $44.83 exceeds the adjusted book value at the date of the offer to sell, but no less than $0.00.

  2. If the shares have been issued for more than seven years at the time of the offer, the purchase price shall be 100% of the adjusted book value at the time of the offer to sell.

It is enforcement of the 1991 Agreement which is at issue here.

The Company's decision to use "adjusted book value" to determine purchase price of a terminated employee's stock, rather than

"book value" as specified in the earlier shareholders' restriction and purchase agreements, was primarily based on the Company's change between 1986 and 1988 from a "C" corporation to a "Subchapter S" corporation. As a "C" corporation, the Company paid corporate income tax on its earnings, and its shareholders paid income taxes on any dividends received by them. The Company elected to become a "Subchapter S" corporation, because net taxable income could then be passed along to the shareholders in proportion to their respective stock interests, and the Company would not be required to pay corporate income tax. Although the change was beneficial to the Company, the shareholders incurred some additional income tax liability during years in which the Company realized net taxable income. For that reason, the Company instituted the practice of making cash distributions to the shareholders to allow them to pay any income tax liability as a result of the change in the Company's tax status.

Between 1990 and 1995, five employee shareholders left the employment of the corporation and had their stock valued in accordance with the terms of the 1991 Agreement. The only adjustment to book value in their individual cases was to account for tax distributions to shareholders due to the corporation's Subchapter S status, as required by the express terms of the 1991 Agreement. In each case, the beginning point for the calculation of adjusted book value was the shareholders' equity as shown by the audited financial statement of the Company for the most recent fiscal year prior to the termination or retirement of the employee.

By the end of 1994, working relations between Kiser and Otis Crowder had become very bad. Otis Crowder and his brother owned about 70% of the outstanding shares of Company stock. In early 1995, the Company decided to terminate Kiser's employment effective 23 January 1995. Kiser's employment was in fact terminated on that date, and he was formally removed as Vice-President and Secretary by the Company's Board of Directors on 3 February 1995.

When he was terminated, the shares of stock issued to Kiser pursuant to the exercise of his 1988 stock options had not fully vested, but his shares issued pursuant to the 1986 stock option plan had been issued more than seven years and had fully vested. On the 1986 shares, Kiser was entitled to receive the full adjusted book value of $56.42 per share, for a total of $112,840.00, a substantial gain over his original investment of $14,000.00. Because the 1988 shares were not

fully vested, however, Kiser was only entitled under the terms of the 1991 Agreement to receive $18.59 per share for a total of $88,302.50, an increase of $55,052.50 over his initial investment. However, had Kiser remained an employee of the corporation an additional seven months, he would have been fully vested in the shares issued to him in 1988, and entitled to receive the full adjusted book value for those shares, an additional $180,000.00. The Company tendered payment, but Kiser refused to sell his stock to the Company in accordance with the 1991 Agreement. The Company then instituted this action to force defendant's specific compliance with the 1991 Agreement. Kiser contested the action, contending that the book value of his shares was not properly calculated, that enforcement of the 1991 Agreement would be unconscionable, and also raised a number of other equitable defenses. On 10 March 1998, the trial court granted the plaintiff Company's motion for summary judgment, and Kiser appealed.

*Kennedy Covington Lobdell & Hickman, LLP, by Russell F. Sizemore and William C. Livingston, for plaintiff appellee.*

*Rayburn, Moon & Smith, P.A., by C. Richard Rayburn, Jr., James B. Gatehouse, and Robert A. Cox, Jr., for defendant appellant.*

HORTON, Judge.

Kiser contends that the trial court erred in granting summary judgment for the Company because (I) there were genuine issues of material fact as to whether plaintiff correctly determined the "adjusted book value" of Kiser's stock as required by the 1991 Agreement; (II) enforcement of the 1991 Agreement would be "unconscionable under the circumstances"; and (III) there are genuine issues of material fact as to equitable defenses to specific performance raised by Kiser. After careful consideration of each issue raised by defendant, we disagree and affirm the judgment of the trial court.

The Standard of Review

A grant of summary judgment may be "fully review[ed] by this Court because [in granting summary judgment] the trial court rules only on questions of law." *King v. N.C. Dept. of Transportation*, 121 N.C. App. 706, 707, 468 S.E.2d 486, 488-89, *disc. review denied*, 343 N.C. 751, 473 S.E.2d 617 (1996). It is familiar learning in North Carolina that summary judgment

is properly granted under North Carolina General Statutes section 1A-1, Rule 56(c) when the pleadings, depositions, answers to interrogatories, and admissions on file, along with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party to the action is entitled to a judgment as a matter of law. . . . Once the moving party has made and supported its motion for summary judgment, section (e) of Rule 56 provides that the burden is then shifted to the non-moving party to introduce evidence in opposition to the motion, setting forth "specific facts showing that there is a genuine issue for trial." At this time, the non-movant must come forward with a forecast of his own evidence.

*Ruff v. Reeves Brothers, Inc.*, 122 N.C. App. 221, 224-25, 468 S.E.2d 592, 595 (1996) (citations omitted).

An issue is only material

if " 'the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action.' "

*Id.* at 225, 468 S.E.2d at 595 (citation omitted).

Thus, on review, this Court must first determine whether there are genuine issues of *material* fact which must be resolved by the trier of fact; if so, the matter must be returned to the trial court for trial. Second, if the material facts are not in dispute, this Court must review the grant of summary judgment to determine whether the trial court correctly applied applicable legal principles to those facts. Here, the parties generally agree about the material facts.

Stock Transfer Restrictions

As with most restrictions on alienation, restrictions on the sale or transfer of shares of stock are not favored and are strictly construed. *Avrett and Ledbetter Roofing and Heating Co. v. Phillips*, 85 N.C. App. 248, 251, 354 S.E.2d 321, 323 (1987); *accord, Bryan-Barber Realty, Inc. v. Fryar*, 120 N.C. App. 178, 461 S.E.2d 29 (1995). In family owned corporations, or other corporations in which all shares of stock are held by a relatively small number of shareholders, it is not unusual for all shareholders to agree that the corporation, or the other shareholders, will be given the first opportunity to purchase the shares of a terminated or retiring shareholder. This agreement is valid

under the North Carolina Corporations Act provided it is "reasonable" and is not "unconscionable under the circumstances." N.C. Gen. Stat. § 55-6-27 (1997). These restrictions allow shareholders to choose their business associates, to restrict ownership to family members, and to ensure congenial and knowledgeable associates. Present or potential business competitors are prevented from purchasing shares and thereby becoming familiar with the corporation's financial condition and future plans. There are also important tax planning reasons for the restrictions:

> Share transfer restrictions also are useful and often necessary to come within various legal categories such as: (a) to maintain an exemption from the securities law's requirements of public registration of securities; (b) to retain the favorable tax status under Subchapter S of the Internal Revenue Code; (c) to achieve status as a statutory close corporation or a professional corporation under state law and the additional flexibility that is sometimes made available to those corporations.

1 O'Neal & Thompson, *O'Neal's Close Corporations* § 7.02 (3d ed. 1987) (hereinafter *O'Neal's Close Corporations*).

Since such restrictions make it even more difficult to dispose of minority stock interests in a closely held corporation, these agreements often contain some version of mandatory "buy-out" provisions to ensure shareholders a ready market for their shares where there otherwise might not be one.

> Buy-Out agreements also may be a means to respond to the uncertainty of the value of shares of a close corporation where there is no ready market to which reference might be made. A buy-out agreement may be seen as a way to avoid disagreement about value that could consume a significant portion of the value of the shares.

*Id.* at § 7.03. For that reason, the buy-out agreement will usually set out a simple formula for determining the price to be paid for the employee's shares in order to ensure a prompt, inexpensive resolution of the question of price. Thus, agreements often set out a formula tied to the "book value" of the corporation because that figure is easily ascertained from the corporation's balance sheet. The "book value" of a corporation is generally understood to mean the value of the corporation's total assets less its total liabilities. The net value realized by the computation is equivalent to the total shareholders'

equity in the corporation. The net book value per share of common stock is then obtained by dividing the shareholders' equity by the total number of shares of stock outstanding. Meigs, Johnson, and Meigs, *Accounting: The Basis For Business Decisions* 611 (4th ed. 1977). The 1991 Agreement provided for a determination of the purchase price per share by providing that the firm of certified public accountants providing accounting services to the corporation would adjust the book value per share to account for several possible contingencies related to the Company's bookkeeping practices. At all times pertinent to this appeal, Deloitte & Touche was the accounting firm servicing the Company's account.

## I. Determination of Adjusted Book Value

[1] Article 6.1 of the 1991 Agreement gives a definition of "adjusted book value" and sets out a method for making a determination of adjusted book value:

Adjusted Book Value: Adjusted book value of the shares of stock of the Corporation for purposes of this agreement shall be defined as the net book value as adjusted as described herein of the shares of stock as of the end of the last fiscal year prior to the death, disability, termination of employment, or offer to sell. The adjusted book value shall be determined by the certified public accountant then servicing the Corporation. In determining the adjusted book value, the certified public accountant shall make any adjustments that may be required to fairly represent the book value of the Corporation, such as adjustments required to reflect funds that need to be distributed to cover the stockholders' tax liability resulting from the Sub[chapter] S distribution of income, the Corporation's use of the completed contract or percentage of completion method of accounting, or the use of LIFO or FIFO accounting or similar timing adjustments. In no even [*sic*] shall the adjusted book value of the Corporation (for the purposes of buying the shares of the Shareholder) include insurance proceeds on the life or disability of the Shareholder whose stock is to be redeemed.

Kiser argues that the adjusted book value of his shares of Company stock was not correctly determined, so that the price offered him for his shares of stock was unconscionably low. Specifically, he contends that the Company's book value, as reported on its 31 March 1994 financial statement, issued at the end of the Company's 1994 fiscal year, should have been adjusted by (A)

increasing shareholders' equity (net book value) by $5,109,906.00 to compensate for alleged over-depreciation of company assets, and (B) increasing net book value by $384,000.00 to reflect the estimated value of the Company's asphalt inventory, and increasing net book value by $221,000.00 to reflect the estimated value of the Company's repair parts inventory. Defendant focuses on the language in the price calculation formula which allows adjustments necessary "to fairly represent the book value of the Corporation, such as adjustments required to reflect funds that need to be distributed to cover the stockholders' tax liability resulting from the Sub[chapter] S distribution of income, the Corporation's use of the completed contract or percentage of completion method of accounting, or the use of LIFO or FIFO accounting or similar timing adjustments."

Having moved for summary judgment, plaintiff has the burden of establishing that there are no genuine issues of material fact on this issue. *Miller Machine Co. v. Miller*, 58 N.C. App. 300, 304, 293 S.E.2d 622, 625, *disc. review denied*, 306 N.C. 743, 295 S.E.2d 478 (1982). In *Miller*, plaintiff corporation sought to meet its burden through the affidavits of two certified public accountants (CPAs), whose credibility was not questioned. The CPAs relied on the most recent audit of the corporate financial statements in forming their opinion as to book value of the corporate shares. The defendant in *Miller* filed the affidavit of Rachel Hailey, a shipping clerk who was employed by the plaintiff corporation. Ms. Hailey averred in her affidavit that prior to the most recent audit of the company books, some $300,000.00 to $400,000.00 of finished goods, as well as a large amount of other inventory, were concealed from the company auditors. This Court indicated that the sworn statement of Ms. Hailey raised a question of fact about the accuracy of the audit upon which the company's book value was based, raising a genuine issue about "the correctness of the review and the book value of the stock." *Id.* at 305, 293 S.E.2d at 625.

Here, Kiser has offered no evidence which raises genuine issues of material fact about the calculation of adjusted book value on the date of his termination from plaintiff corporation. The 1991 Agreement provided that adjusted book value per share was to be determined by beginning with the book value of the corporation as shown on the financial statement at the end of the last fiscal year. Here, the 31 March 1994 financial statement showed a total stockholders' equity of $6,425,958.00 as of 31 March 1994. There were 113,900 shares of stock outstanding at that time, so that the book

value of each share of stock was approximately $56.42. The 31 March 1994 financial statement was audited and approved by Deloitte & Touche in its report issued on 28 June 1994. The Company did not make any adjustments to book value in order to determine adjusted book value, however, because it did not appear that any events requiring adjustments occurred during the 1994 fiscal year.

First, the Company concluded that the tax benefits to stockholders in 1992 and 1993 from the reported losses exceeded their tax liability in 1994 and therefore it made no distributions to them. There being no "Subchapter S" distributions, the Company determined that book value did not need to be adjusted for that reason. Second, the Company determined that no "timing" adjustments were necessary because the Company used the accrual (percentage-of-completion) method for reporting taxable income, the first in-first out (FIFO) method of accounting for inventory, and the straight-line method for depreciation purposes. Subsequently, for the purposes of this litigation, the Company requested Deloitte & Touche to review the calculations of adjusted book value per share of its stock as of 31 March 1994, to be certain that the Company had correctly determined adjusted book value per share of Kiser's stock. Deloitte & Touche concluded that adjusted book value was correctly calculated by adopting the book value amount of $56.42 per share, because no adjustments to book value needed to be made. Deloitte & Touche further determined that the Company's financial statements for the 1994 fiscal year were "prepared in accordance with generally accepted accounting principles customarily employed by construction contractors for external reporting to Company stockholders, banks, bonding companies and others[,]" and agreed that no "timing adjustments" were necessary to fairly reflect adjusted book value.

Defendant assigns error to the calculation of the adjusted book value of his shares of stock, contending that adjustments for (A) asphalt and repair parts inventories and for (B) over-depreciation should have been made.

In determining whether the parties contemplated adjustments of book value by modifying the usual depreciation schedule used by the Company, or by adding adjustments for asphalt and repair parts inventories, we must look to the intent of the parties when the contract in question, the 1991 Agreement, was entered into. In determining the intent of the parties to a contract, we must look to all circumstances surrounding the making of the agreement, including the language of the contract, its purposes and subject matter, and the

situation of the parties at the time the contract was executed. *Adder v. Holman & Moody, Inc.*, 288 N.C. 484, 492, 219 S.E.2d 140, 196 (1975). We may also consider the way and manner in which the parties to the contract have carried out the terms of the 1991 Agreement since its execution.

(A) Asphalt and Repair Parts Inventories

Historically, the value of the Company's recycled asphalt products (RAP) material stockpiles or its equipment parts inventory were not reflected on its balance sheet. During fiscal year 1995, the Company inventoried its RAP stockpiles and estimated the value at $425,000.00. The Company also inventoried its stockpile of equipment repair parts, and valued the inventory of those parts at $257,000.00. Defendant argues that, if those inventories were present in fiscal year 1995, they must also have existed in substantial part during the fiscal year 1994, and therefore the total amount of $682,000.00 should have been added to the shareholders' equity, increasing the net book value of each share of stock. While we agree with defendant that the inventories of parts and asphalt were presumably present to some extent during the 1994 fiscal year, we do not believe that the failure to include an allowance for such inventories was prejudicially erroneous.

First, we note that asphalt and repair parts inventories were included in the Company's balance sheet for the first time in 1995. At all earlier times pertinent to this litigation, they were not reflected on the Company's balance sheets. Thus it cannot be said that defendant and other shareholders entered into the 1991 Agreement anticipating that the adjusted book value of the Company's shares would reflect an adjustment for either asphalt or repair parts inventories. Whether or not defendant, in his capacity as Chief Financial Officer, made the decision that those items not be reflected on the Company's balance sheet, defendant certainly would have been aware of the Company's accounting policies and practices. During the period here in question, defendant was a corporate officer, Chief Financial Officer, and was himself a CPA. There is no evidence forecast here that the parties to the 1991 Agreement intended, or expected, that book value would be adjusted by these inventories to arrive at adjusted book value. Second, such adjustments had not been made in the past in calculating the value of the stock of the five persons who left the employ of the Company between 1990 and 1995, either by termination or retirement. The manner in which the parties routinely carried out the terms of the 1991 Agreement is certainly some indication of

their understanding of its terms. Defendant denies that he actually performed the calculations on the amounts to be received by the withdrawing employees, but that is not a *material* question of fact which must be resolved. What is important is that defendant was well aware of the interpretation historically given the language of the 1991 Agreement.

Further, on 1 September 1993 defendant rendered a letter opinion to an attorney in an equitable distribution case in which a Company employee was a party, giving the "current, redeemable value" of the employee's stockholdings in the Company. In doing so, defendant made none of the adjustments which he now complains should have been made in his case. Thus, less than five months before defendant's termination, he calculated adjusted book value per share of Company stock, precisely as was done here. Third, the omission of the asphalt and repair parts inventories from the balance sheet is not prejudicial to defendant. During fiscal year 1995, the Company also made an inventory of the raw materials it stockpiled for use in its asphalt production operation. The raw materials had not been inventoried for years. As a result, the Company found that its normal asphalt inventory was overstated by about $753,000.00. Thus, if the overstated amount of asphalt inventory had been included in the balance sheet, it would have more than compensated for the failure to include $682,000.00 for repair parts and recycled asphalt inventories.

### (B) Depreciation Schedule

Defendant also contends that the Company's method of depreciating its equipment unfairly lowers the book value of its stock, reducing the amount to which he is entitled for his shares. He argues that the shareholders' equity of the Company should be adjusted upward in the amount of $5,109,906.00 to compensate for the over-depreciation of the equipment. We disagree with defendant and overrule this assignment of error.

"Book value of a share of stock, in its simplest form, is the corporation's assets minus its liabilities as shown on the corporate books, divided by the number of shares of stock outstanding." 1 *O'Neal's Close Corporations* § 7.27. This method of valuation is frequently used in buy-out agreements because of its simplicity. While book value gives a "snapshot" of the value of a corporation at any point in time, it is not intended to represent the fair market value of a corporation. It does not, for example, reflect the value of company goodwill. The value of the company's assets and equipment as shown

CROWDER CONSTR. CO. v. KISER

[134 N.C. App. 190 (1999)]

on the balance sheet represents the depreciated value of such assets, not their fair market value. The use of depreciation schedules merely reflects the fact that assets decline in value due to time and use. Rather than making an actual appraisal of the value of a depreciable asset each year, companies spread the asset's initial cost over a period of years estimated to be its useful life, after making an allowance for salvage value. Depreciation is not a process of valuation, however. Particular assets may have a fair market value which is lower or higher than that shown on the depreciation schedule. Thus, if one seeks to determine the fair market value of a company by using its balance sheet as a beginning point, it is necessary to adjust the depreciated value of the company's assets to reflect the fair market value of those assets. Here, the Company used the straight-line method of accounting for the depreciation of assets for purposes of compiling its balance sheet. In the straight-line method, the salvage value (if any) of an asset is first subtracted from its cost, and the balance is then spread equally over the period of its useful life.

Here, defendant seeks to have a value assigned to company assets and equipment which more closely approximates the fair market value of the assets in question. Defendant complains that the salvage value assigned to Company assets is too low, so that assets still retain value and are often sold by the Company at prices greater than the estimated salvage values. Defendant is, in effect, attempting to value the equipment owned by the Company at fair market value, rather than the depreciated value at which it is carried on the Company's books.

> Fixed assets usually are carried on the books at their historical cost (e.g., their purchase price) less depreciation at standardized rates to reflect the wearing out of those assets. However, because of changes in business, the costs of replacing those assets may be much greater or much less than the recorded figures. Inflation may cause great appreciation in the value of some assets, but that will usually not be reflected on the books of the business until there has been a reliable third party transaction to verify the new value. Further, depreciation rates often do not match actual depreciation and great variations result when different criteria are applied to a single fact situation. In many instances, equipment that has been completely depreciated on the books is still in use and can be sold for a substantial sum.

1 *O'Neal's Close Corporations* § 7.27.

In 1991, when the new Stock Purchase Agreement was being negotiated, defendant sought to have the Company value the Company stock at fair market value, rather than tying the redemption value of the stock to its book value. The Company expressly rejected the use of fair market value, and all parties agreed on the use of adjusted book value. The question here is whether the Company departed from generally accepted accounting practices in determining the method of depreciation used by the Company. Further, defendant was in a position during all pertinent times to participate in the financial structuring of the Company, and the depreciation methods used by the Company are exactly the same methods used during the time defendant was Chief Financial Officer of the Company. There is no evidence that there were any changes made in the method of depreciation to devalue the shares of stock owned by defendant. Instead, the Company utilized the same method historically used to value Company assets, matters well known to defendant.

Third, it is not significant that the Company uses different methods of depreciation for tax purposes and for its balance sheet. As Deloitte & Touche pointed out in its review, the Company does not use the accelerated method of depreciation for purposes of its balance sheet, but uses the straight-line method. The quarrel between Deloitte & Touche and the accountant-witness retained by defendant does not involve questions of mathematical errors, but a decision over what type of depreciation methods to use in valuing company equipment. There is no contention that Deloitte & Touche failed to follow generally accepted auditing standards in reviewing the Company's financial statement. Defendant merely wants to use a different method of depreciation so as to make the value of the equipment more closely resemble fair market value, an approach considered and rejected before the agreement in question was entered into. The same method of depreciation was being employed by the Company earlier when each of the five employees of the Company left employment with the Company and had their stock value calculated. There was not at any of those times any suggestion that the Company's method of depreciation of its assets was not in accordance with generally accepted accounting practices, or that it worked an unconscionable injustice to the departing employees.

Where the value of a closely held corporation is determined by the use of its balance sheet as directed by a "buy-out" agreement, and is calculated by the accounting firm normally servicing that corpora-

tion in accordance with the terms of the "buy-out" agreement, we hold that the value determined by that accounting firm is presumptively correct, in the absence of mathematical error, evidence of fraud (such as the willful concealment of assets), or evidence of a failure to follow generally accepted accounting practices. This assignment of error is overruled.

## II. Unconscionability of Stock Purchase Agreement

[2] N.C. Gen. Stat. § 55-6-27(a) (Cum. Supp. 1997) provides in part that "an agreement among shareholders, or an agreement between shareholders and the corporation may impose restrictions on the transfer or registration of transfer of shares of the corporation." Such restrictions are "valid and enforceable against the holder or a transferee of the holder if the restriction is authorized by this section, [and] it is not unconscionable under the circumstances . . . ." N.C. Gen. Stat. § 55-6-27(b). We note that the language, "it is not unconscionable under the circumstances," was added to that portion of the 1984 Revised Model Business Corporation Act (Model Act), which is now N.C. Gen. Stat. § 55-6-27, when it was enacted by the 1989 General Assembly. Since the law of unconscionability as a defense to the enforcement of a contract was already well settled in North Carolina at the time of the amendment, we believe the legislative intent was to allow a court called upon to enforce a stock restriction agreement to consider whether the enforcement of the agreement is unconscionable at the time enforcement is sought.

We gain further support for our opinion from the language of the commentary to N.C. Gen. Stat. § 55-6-27. When the 1984 Revised Model Business Corporation Act (now Chapter 55 of our General Statutes) was enacted, the legislation required that:

> The Revisor of Statutes shall cause to be printed along with this act all relevant portions of the Official Comments to the 1984 Revised Model Business Corporation Act and all explanatory comments of the drafters of this act as the Revisor may deem appropriate.

1989 N.C. Sess. Laws ch. 265, § 2.

The North Carolina Commentary to N.C. Gen. Stat. § 55-6-27 explains that the language, "it is not unconscionable under the circumstances," was added to

> address[] a concern that the Model Act's section 6.27 may allow the enforcement of unconscionable restrictions. The drafters

noted that the Model Act's language in section 6.27 may not allow judicial discretion in a situation where there was initially a reasonable purpose in imposing a restriction but over time the effect of the restriction had become unreasonable because of a change in circumstances. Judicial discretion would allow a court in such a situation to judge the restriction at the time its validity and enforceability are questioned. The amendment does not represent an attempt to change the prior law in North Carolina with respect to unconscionable agreements, but rather to preserve expressly the equitable power of the courts to deny enforcement of agreements that are unconscionable under the circumstances.

N.C. Gen. Stat. § 55-6-27, Commentary.

We are aware that commentaries printed with the North Carolina General Statutes, which were not enacted into law by the General Assembly, are not treated as binding authority by this Court. *See State v. Hosey*, 318 N.C. 330, 337-38 n.2, 348 S.E.2d 805, 809-10 n.2 (1986); *State v. Kim*, 318 N.C. 614, 620 n.3, 350 S.E.2d 347, 351 n.3 (1986) (noting that the Supreme Court gives the commentaries printed with the North Carolina Rules of Evidence "substantial weight" in determining legislative intent). Consistent with the practice of our Supreme Court, we have given the Commentary "substantial weight" and found that the comment supports our conclusion. We hold, therefore, that when considering the enforcement of a stock restriction agreement entered into pursuant to N.C. Gen. Stat. § 55-6-27, a trial court may decline to specifically enforce the agreement if there has been a change of circumstances since the execution of the stock restriction agreement such that its enforcement would be unconscionable under the particular circumstances of the individual case. Defendant advances a variety of additional arguments to support his position that the trial court should determine unconscionability of stock restriction agreements at the time enforcement is sought, but we need not discuss them in light of our holding.

Defendant also argues that he has forecast sufficient evidence to present a question of material fact with regard to the unconscionability of the stock purchase agreement, and that summary judgment for plaintiff was erroneously entered.

The law of unconscionability in the context of a contract dispute is well developed in North Carolina:

**CROWDER CONSTR. CO. v. KISER**

[134 N.C. App. 190 (1999)]

A court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other . . . . In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable.

*Brenner v. School House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981) (citations omitted). Defendant contends, however, that unconscionability should not be weighed and determined using decisions from the area of contract law, but should be viewed in light of defendant's "reasonable expectations" about being able to complete his employment with the Company and thus realize full value for his shares of stock. As support for this approach, defendant relies on the decision of our Supreme Court in *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983).

As defendant recognizes, *Meiselman* uses language about the "reasonable expectations" of a complaining shareholder in a close corporation, but does so in a case involving the application and interpretation of portions of the corporation law dealing with the dissolution of corporations when necessary to protect the rights of a shareholder. Although *Meiselman* is clearly distinguishable, and does not control our decision in this case, we note that in *Meiselman* the Supreme Court stresses that the key to "reasonable expectations" is "reasonable." "In order for plaintiff's expectations to be reasonable, they must be known to or assumed by the other shareholders and concurred in by them. Privately held expectations which are not made known to the other participants are not 'reasonable.'" *Id.* at 298, 307 S.E.2d at 563. We decline to adopt a "reasonable expectations" approach here, since such an approach would render the objective language of the written contract nugatory, would be contrary to the express purposes for entering into stock restriction and purchase agreements, and would inevitably lead to uncertainty, delay and expense as the trial courts attempt to determine the "expectations" of a terminated employee, and to further determine whether those expectations were "reasonable." Instead, we conclude that the issue before us is whether defendant's forecast of evidence raises

questions of material fact about the unconscionability of the 1991 Agreement, using the settled definition of unconscionability from our contract law.

Once plaintiff made and supported its motion for summary judgment, the burden shifted to defendant to forecast his own evidence and set forth "specific facts showing that there is a genuine issue for trial." Defendant Kiser contends that he has carried his burden, in that his evidence raises at least three genuine issues of material fact, and that a resolution in his favor on any or all of the three issues would require that the trial court find that the stock purchase agreement was unconscionable, and was therefore invalid and unenforceable. Specifically, defendant contends that there is a genuine issue of fact as to (A) whether the termination of his employment was designed to deprive him of a full return on his investment; (B) whether plaintiff expressly agreed with defendant Kiser that defendant would not be terminated prior to fully vesting under the 1991 stock purchase agreement; and (C) whether the price plaintiff offered him for his stock was unconscionable because it was substantially less than fair market value.

### (A) Termination of Defendant Prior to Full Vesting

Defendant was terminated some seven months before his 1988 stock options would have fully vested. Defendant contends that by prematurely terminating him, plaintiff saved $180,000.00 which defendant would have been due, and that defendant's termination only seven months before he would have been fully vested raises a reasonable inference—and thus a triable issue of fact—that the termination was motivated by plaintiff's desire to avoid paying defendant full value for his shares of stock. We disagree.

Plaintiff met its burden by forecasting evidence to show a reasonable business purpose in terminating defendant. Plaintiff's evidence tends to show that defendant was discharged for openly questioning the ability and competence of Company management to guide the affairs of the Company, resulting in an adversarial relationship between Kiser and other members of management. Rather than disputing the evidence of plaintiff and thus raising a genuine issue of material fact, defendant's deposition testimony tends to substantially agree with the situation within the Company. For example, defendant testified as follows during his deposition:

Q. Did you, from time to time, express the opinion to others in management of the company that Otis Crowder was not doing a

good job as the president of the company?

A. I shared that view as others shared it to me. The context would come up that what can we do about Otis? What are we going to do? Can't—what are you going to do? I'd say, "I don't know what I'm going to go do. He's the president of the Company. He tells me what to go do." "Well, can't you go talk to him?" I'd say, "No." "Well, how you get rid of him? How's he get out of here?" [sic] I'd say, "He owns the company. He's the president of the company." There's those that are sitting there right now that were asking me that with the exception of probably one or two. But, that's the gist. It's what do we do?

Q. Did you share with them your opinion that he was not doing a good job?

A. I felt like we needed direction, and, yeah, I told them.

Q. Did you ever make the statement to Mike Wilson that Otis and Bill Crowder were dumber than hell?

A. I don't remember that.

Q. Did you ever say, "Can you believe how stupid those Crowders are?"

A. If I said that, I don't remember.

Q. Did you tell or express an opinion to the people of the company that Otis was incompetent?

A. I probably did.

Q. Did you ever express the opinion that he was not doing his job?

A. Yes.

Q. Did you ever make the statement that he didn't have the balls to make decisions?

A. Yes.

. . . .

Q. Would it be fair to say that your relationship with Otis Crowder deteriorated during the course of the last 12-1 [sic] months of your employment there?

A. Yes.

CROWDER CONSTR. CO. v. KISER

[134 N.C. App. 190 (1999)]

Defendant was at all times an employee at will of plaintiff. Nothing in his employment contract, the 1991 Agreement, or 1986 and 1988 stock option agreements guaranteed defendant continued employment with plaintiff. Even assuming, for the sake of argument, that enforcement of the stock purchase agreement would be inequitable if plaintiff had terminated defendant's employment solely to prevent his stock options from fully vesting, defendant comes forward with no evidence to support his bare assertion that he was discharged for an improper purpose. If we were to adopt defendant's position, every employee holding restricted stock subject to a buy-out agreement who is discharged by his or her company prior to the date the shares are fully vested, would, without further proof of improper motive on the part of that company, have raised an issue of material fact which would have to be submitted to a trier of fact for decision. Other than defendant's argument that an inference of wrongful purpose arises from his termination, defendant does not offer any evidence to show there is a genuine question for trial on the issue of his early termination. Plaintiff having offered competent evidence of a justifiable business purpose motivating defendant's termination, and defendant having failed to offer evidence on this issue in opposition to the motion for summary judgment, the trial court properly entered summary judgment on this issue.

The decision of the New York Court of Appeals in a strikingly similar case, *Gallagher v. Lambert*, 74 N.Y.2d 562, 549 N.E.2d 136 (1989), *reh'g denied*, 75 N.Y.2d 866, 552 N.E.2d 179 (1990), supports our result. Plaintiff Gallagher was employed by defendant corporation. He purchased stock in the corporation pursuant to a stock restriction and buy-out agreement, which provided that, if his employment ended prior to 31 January 1985 for any reason, Gallagher would receive only book value for his shares. However, if plaintiff Gallagher's employment lasted beyond 31 January 1985, he would receive an increased price tied to corporate earnings for his shares. Gallagher was terminated by defendant prior to 31 January 1985, and sued claiming that his at-will employment was terminated in "bad faith" in order to deprive him of a higher price for his shares of stock. The trial court in *Gallagher* denied summary judgment, ruling there was a question of fact as to defendant's motive in firing Gallagher, but the appellate division reversed the trial court, awarding summary judgment to defendant corporation and ordering specific performance of the repurchase agreement. The New York Court of Appeals, after discussing stock restriction agreements, affirmed, stating:

These provisions, which require an employee shareholder to sell back stock upon severance from corporate employment, are designed to ensure that ownership of all of the stock, especially of a close corporation, stays within the control of the remaining corporate owners-employees; that is, those who will continue to contribute to its successes or failures. These agreements define the scope of the relevant fiduciary duty and supply certainty of obligation to each side. They should not be undone simply upon an allegation of unfairness. This would destroy their very purpose, which is to provide a certain formula by which to value stock in the future . . . .

Gallagher accepted the offer to become a minority stockholder, but only for the period during which he remained an employee. The buy-back price formula was designed for the benefit of both parties precisely so that they could know their respective rights on certain dates and avoid costly and lengthy litigation on the "fair value" issue. Permitting these causes to survive would open the door to litigation on both the value of the stock and the date of termination, and hinder the employer from fulfilling its contractual rights under the agreement. This would frustrate the agreement and would be disruptive of the settled principles governing like agreements where parties contract between themselves in advance so that there may be reliance, predictability and definitiveness between themselves on such matters. There being no dispute that the employer had the unfettered discretion to fire plaintiff at any time, we should not redefine the precise measuring device and scope of the agreement.

*Gallagher*, 74 N.Y.2d at 567, 549 N.E.2d at 137-38 (citations omitted).

(B) Agreement Not to Terminate Defendant

Defendant argues that he continued his employment with plaintiff, even though he was not being adequately compensated by way of salary, only because defendant was assured by Otis A. Crowder, as President, that he would not be terminated before his stock options vested. Defendant further argues that there is a material issue of fact about the assurances of his continued employment, and that summary judgment should not have been entered for that reason. We do not agree.

The affidavits filed by both defendant Kiser and Otis A. Crowder are in substantial agreement about the conversation in question. In his affidavit, Kiser stated that:

Eventually I came to realize and perceive scenarios under which the controlling shareholders might cause the Company to terminate shareholders and force them to sell at a disadvantageous time or prior to good economic news. When I raised this possibility with Otis Crowder, he assured me that they "would never do that."

Defendant elaborated on his recollection of the conversation in his deposition:

There was—There was one potential discussion that Otis and I had and that dealt with—in the context of a purchase, I mean of a sale of the company, that wherein I raised the issue that, "Otis, you can theoretically if you know of an impending sale of this company, you could come in here and terminate everybody that's a non-family member and then sell the company at a substantially higher price and reap the benefits." I know exactly where we were sitting when we said that. And he said, "Oh, we'd never do something like that." I said "Don't you think it'd be important that we do something with it." And he said "No, it ain't never going to happen. Quit worrying about that kind of stuff. Don't worry about it."

Otis A. Crowder's recollection of the conversation is substantially similar to that of defendant. He stated in his deposition that

the only conversation that I recall where that was brought up as an issue was Mr. Kiser came into my office, and I believed he had the documents finally in hand after—whatever the option document. And he was laughing in a funny way. He came in and said, "You know, Otis, you could really"—excuse the term—"screw these optionees if you had an offer—somebody wanted to buy the company and offered to buy the company, and you terminated them so you could buy their stock and then sell it at a higher price." And my reply is, "I wouldn't do that."

Read together and in context, it is obvious that defendant Kiser was concerned about a situation in which the Crowders, the controlling shareholders, might receive an offer to purchase the Company and might discharge the minority shareholders so as to secure the shares of stock of the minority shareholders at book value and then sell the stock for its higher fair market value. There are no significant differences in the versions of the conversation between defendant and Otis Crowder, and no triable issue of fact is raised. Even assum-

ing for the purpose of argument that Otis Crowder promised defendant he would not be prematurely discharged in order to deprive him of the full value of his stock, there is absolutely no showing by defendant that his discharge was for a wrongful purpose. The unrebutted evidence tends to show that defendant's discharge was for a valid business purpose. The trial court properly entered summary judgment on this issue.

### (C) Disparity Between Book Value and Fair Market Value

Defendant argues that it would be unconscionable to require him to accept the adjusted book value tendered by plaintiff for his stock options, because the fair market value of the corporation substantially exceeds its adjusted book value. Defendant made much the same argument in Issue I above.

The parties specifically discussed, but rejected, using a "buy-out" formula based on the fair market value of the shares. Use of fair market value would require an expensive and time-consuming valuation process each time an employee's shares were offered to the corporation under the stock purchase agreement. The delay and uncertainty would be beneficial neither to the Company nor the employee. Further, the fair market value approach was specifically rejected after negotiations and discussions in which defendant was involved. Yet defendant freely entered into the 1991 Agreement which set out the adjusted book value formula which he now contests as unconscionable. The stock purchase agreement was entered into on 21 March 1991, and defendant was terminated on 23 January 1995, less than four years later. Defendant did not forecast evidence of any change in circumstances during that four-year interval which would render the arm's-length agreement between defendant and plaintiff unconscionable and unenforceable, and the trial court properly granted summary judgment on this issue.

### III. Other Equitable Defenses

[3] Defendant further argues that (A) the 1991 Agreement did not require him to tender his shares of stock to plaintiff immediately upon termination and that he was entitled to wait for a reasonable time before doing so. Defendant also argues that (B) the Company's decision to take a business expense deduction for tax purposes based on its loss arising from the stock it optioned to its employees caused defendant to incur an unexpected tax liability, and thus made the stock purchase agreement unconscionable.

(A) Timing of the Tender Offer

Defendant argues that he was not required by the terms of the 1991 Agreement to immediately tender his stock options to the Company for purchase. Defendant contends that he could wait a "reasonable time" before tendering his shares, and even until his 1988 options were fully vested before offering them for purchase.

The 1991 Agreement provides in Section 3.2 that:

In the event that the employment of a Shareholder is terminated with the Corporation for any reason whatsoever, he shall offer his shares to the Corporation and the Corporation shall purchase his shares at the price provided in the paragraph 3.1 above.

Section 3.1 of the Agreement sets out the formula for determining the purchase price of any shares issued by the Company pursuant to the 1986, 1988, and 1990 stock option plans. In every instance, the calculation of the purchase price of an employee's shares is tied directly to the adjusted book value of the Company's stock. Adjusted book value is defined in Section 6.1 of the 1991 Agreement as the net book value as adjusted at the end of the last fiscal year prior to the termination of a shareholder's employment. Further, Section 3.4(C) of the stock purchase agreement provides that the "closing [of the stock repurchase transaction] shall be within 90 days of the offer, death or termination of the employee, *whichever is earlier*." (Emphasis added.) Therefore, the 90-day period contemplated for closing expresses the parties' intent with regard to timing of the offer and payment.

Moreover, defendant would gain nothing by a long delay in tendering his shares. The adjusted book value will be determined by reference to the Company's financial statement on 31 March 1994, the end of its last fiscal year prior to the date of defendant's termination. This assignment of error is overruled.

(B) Change in Tax Reporting

[4] When defendant and other employees of the Company exercised their stock options and purchased shares of Company stock, they understood that they would be liable ultimately pursuant to Section 83 of the Internal Revenue Code for any income tax liability arising from the increase in value of the Company stock over the option price of $7.00 per share. Defendant contends that, when he exercised his options in 1986 and 1988, the opinion of Deloitte & Touche was that an employee would not actually incur any tax

liability until the employee sold the stock he obtained by exercising his stock options.

In July 1994, however, Deloitte & Touche expressed the revised opinion that the Company employees who received stock under the stock option plans would realize taxable income when the shares were fully vested, that is, on the seventh anniversary of the exercise of their options. Deloitte & Touche advised the Company that revised W-2 forms for the calendar year 1993 should be issued to employees holding shares they obtained from the exercise of the 1986 stock option plan. The revised W-2 forms would reflect the Section 83 "income" from the increase in value of the Company's shares. Otherwise, the Company might be penalized for failure to report income and failure to withhold income taxes. Deloitte & Touche further advised the Company that the additional "income" received by the shareholders would result in a business expense deduction to the Company.

Defendant argues that the business expense deduction directly benefitted the Company's majority shareholders because they did not receive their shares from the stock option plans, and their taxable incomes would be reduced as a result. Defendant vigorously disputed the advice of Deloitte & Touche, and the matter was referred to the national office of Deloitte & Touche in Washington. The Deloitte & Touche national office advised the Company in December 1994 that, although there would be a taxable event on the seventh anniversary of the exercise of the 1986 stock options, the Company did not have to report the Section 83 income at that time unless it intended to claim a business deduction based on that event. Thereafter, the Company elected to issue amended W-2 forms to the affected employees reflecting the Section 83 income from the increase in their shares, and the Company then took a corresponding business expense deduction to account for its paper "loss" as a result of the income to the employees.

A meeting was scheduled for 24 January 1995 to explain the situation to the affected employees, but defendant was terminated by the Company on 23 January 1995. The Company subsequently made interest-free loans to its employees who held shares resulting from the exercise of the 1986 stock options and who thus had Section 83 income as a result. Because defendant's employment had been terminated, he did not receive an interest-free loan to pay his tax liability from the gain on his shares of stock. Under the terms set out in the 1991 Agreement, defendant is not entitled to receive the entire price

for his shares of stock in a lump sum, but will receive an initial payment of $47,355.00, with the balance of $153,788.00 spread over seven years and secured by a promissory note from the Company.

Defendant argues that it would be unconscionable to require him to sell his shares for less than their fair market value, and then to structure payment of the purchase price in such a way that his "down payment" would be consumed in large part by income taxes. We have previously discussed—and rejected—defendant's contention that some sort of fair market value standard should be substituted for the adjusted book value standard agreed upon by defendant and the other shareholders in 1991. Defendant now also contends that the manner of payment for his stock should be different from the written agreement. However, we decline to rewrite the 1991 Agreement and thereby substitute our judgment for that of the contracting parties. Further, defendant is not prejudiced by the Company's decision to report defendant's gain on his stock, since in any event defendant will have to report for income tax purposes he gain on his shares as a result of their sale to the Company under the 1991 Agreement. This assignment of error is overruled.

Despite the volume of the evidence, the parties are in substantial agreement on the material facts which give rise to this dispute. Although the language of the 1991 Agreement is clear and unequivocal and was intended to provide a simple and foreseeable result upon the termination of an employee, this litigation has delayed the resolution of this matter for more than four years since defendant's termination in January 1995. We have carefully considered the arguments and positions advanced by defendant, but find an insufficient forecast of evidence to raise a genuine issue of material fact. The trial court properly entered summary judgment for plaintiff.

Affirmed.

Chief Judge EAGLES and Judge TIMMONS-GOODSON concur.